JOHN H. CLYMER, administrator, *vs.* JAMES P. MAYO, JR.,
& others[1]
(and two companion cases).

Essex.  October 1, 1984. — January 28, 1985.

Present: HENNESSEY, C.J., WILKINS, ABRAMS, & NOLAN, JJ.

*Devise and Legacy,* Gift to trustee of inter vivos trust, "Pour over," Revoca-
tion by divorce or annulment. *Trust,* Validity, Termination, Beneficiary,
Revocation by divorce or annulment. *Probate Court,* Standing, Counsel
fees. *Practice, Civil,* Standing. *Executor and Administrator,* Removal.

By virtue of G. L. c. 203, § 3B, an inter vivos trust executed by a settlor con-
temporaneously with the execution of her will was valid even though
the trust did not receive funding until the settlor's death. [758-759]
Where the terms of a will provided that the assets of the estate of the testatrix
were to pour over into an inter vivos trust she had created contemporane-
ously with the will and the trust was held to be valid, the parents of the
testatrix, who were her sole heirs at law but were not beneficiaries of
the trust, had no standing to seek removal of the administrator of the
testatrix's estate. [759-763]
Where a trust instrument showed that the settlor's intent was to qualify the
trust for an estate tax marital deduction, and where this purpose became
impossible to achieve after the settlor was divorced from her husband,
a Probate Court judge properly terminated the trust. [763-764]
Where a trust was to receive its funding at the settlor's death, in part through
her life insurance policy and retirement benefits, and in part through a
pour-over under the residuary clause of her will, and where the settlor
was divorced from her husband after executing the trust and her will,
the husband's interest in the trust was revoked by virtue of G. L.
c. 191, § 9. [764-768]
Under a trust instrument naming as beneficiaries "the nephews and nieces of
the Donor living at the time of the death of the Donor," executed by a
settlor who had no nieces or nephews by blood, a Probate Court judge
did not err in considering extrinsic evidence of the settlor's meaning
and intent, in concluding that the settlor had intended to benefit the
nephews and niece of her husband at the time she created the trust, and

---

[1] The other defendants are Joseph A. Weiss, Maria Weiss, and John P.
Hill, trustee.

in finding that the settlor's subsequent divorce from her husband did not by implication revoke the provisions of the trust benefiting the nephews and niece of the former husband. [768-772]

Where it appeared that a Probate Court judge had failed to consider all relevant criteria in awarding counsel fees pursuant to G. L. c. 215, § 39B, the matter was remanded for reconsideration of the award in light of such factors as the size of the estate, the merits of the claims raised, the benefit of the litigation to the administration of the estate, and the success of the various parties on their claims. [772-773]

CIVIL ACTIONS commenced in the Essex Division of the Probate and Family Court Department on February 7, 1983.

PETITION filed in that court on August 12, 1983, for the removal of the administrator of the estate of Clara A. Mayo.

The matters were heard by *Edward J. Rockett*, J.

*Lawrence S. Elswit* (*Todd L.C. Klipp* with him) for trustees of Boston University.

*Michael J. Michaeles* for Clark University.

*Peter L. Koff* (*Edward F. Lawson* with him) for Joseph A. Weiss & another.

*John H. Clymer*, administrator, pro se.

*George T. Shaw*, guardian ad litem.

*Peter A. Belmonte* (*Rita M. McGeary* with him) for James P. Mayo, Jr.

HENNESSEY, C.J. This consolidated appeal arises out of the administration of the estate of Clara A. Mayo (decedent). We summarize the findings of the judge of the Probate and Family Court incorporating the parties' agreed statement of uncontested facts.

At the time of her death in November, 1981, the decedent, then fifty years of age, was employed by Boston University as a professor of psychology. She was married to James P. Mayo, Jr. (Mayo), from 1953 to 1978. The couple had no children. The decedent was an only child and her sole heirs at law are her parents, Joseph A. and Maria Weiss.

In 1963, the decedent executed a will designating Mayo as principal beneficiary. In 1964, she named Mayo as the beneficiary of her group annuity contract with John Hancock

Mutual Life Insurance Company; and in 1965, made him the beneficiary of her Boston University retirement annuity contracts with Teachers Insurance and Annuity Association (TIAA) and College Retirement Equities Fund (CREF). As a consequence of a $300,000 gift to the couple from the Weisses in 1971, the decedent and Mayo executed new wills and indentures of trust on February 2, 1973, wherein each spouse was made the other's principal beneficiary. Under the terms of the decedent's will, Mayo was to receive her personal property. The residue of her estate was to "pour over" into the inter vivos trust she created that same day.

The decedent's trust instrument named herself and John P. Hill as trustees. As the donor, the decedent retained the right to amend or revoke the trust at any time by written instrument delivered to the trustees. In the event that Mayo survived the decedent, the trust estate was to be divided into two parts. Trust A, the marital deduction trust, was to be funded with an amount "equal to fifty (50%) per cent of the value of the Donor's 'adjusted gross estate,' . . . for the purpose of the United States Tax Law, less an amount equal to the value of all interest in property, if any, allowable as 'marital deductions' for the purposes of such law . . . ." Mayo was the income beneficiary of Trust A and was entitled to reach the principal at his request or in the trustee's discretion. The trust instrument also gave Mayo a general power of appointment over the assets in Trust A.

The balance of the decedent's estate, excluding personal property passing to Mayo by will, or the entire estate if Mayo did not survive her, composed Trust B. Trust B provided for the payment of five initial specific bequests totalling $45,000. After those gifts were satisfied, the remaining trust assets were to be held for the benefit of Mayo for life. Upon Mayo's death, the assets in Trust B were to be held for "the benefit of the nephews and nieces of the Donor" living at the time of her death. The trustee was given discretion to spend so much of the income and principal as necessary for their comfort, support, and education. When all of these nephews and nieces reached the age of thirty, the trust was to terminate and its

remaining assets were to be divided equally between Clark University and Boston University to assist in graduate education of women.

On the same day she established her trust, the decedent changed the beneficiary of her Boston University group life insurance policy from Mayo to the trustees. One month later, in March, 1973, she also executed a change in her retirement annuity contracts to designate the trustees as beneficiaries. At the time of its creation in 1973, the trust was not funded. Its future assets were to consist solely of the proceeds of these policies and the property which would pour over under the will's residuary clause. The judge found that the remaining trustee has never received any property or held any funds subsequent to the execution of the trust nor has he paid any trust taxes or filed any trust tax returns.

Mayo moved out of the marital home in 1975. In June, 1977, the decedent changed the designation of beneficiary on her Boston University life insurance policy for a second time, substituting Marianne LaFrance for the trustees.[2] LaFrance had lived with the Mayos since 1972, and shared a close friendship with the decedent up until her death. Mayo filed for divorce on September 9, 1977, in New Hampshire. The divorce was decreed on January 3, 1978, and the court incorporated into the decree a permanent stipulation of the parties' property settlement. Under the terms of that settlement, Mayo waived any "right, title or interest" in the decedent's "securities, savings accounts, savings certificates, and retirement fund," as well as her "furniture, furnishings and art." Mayo remarried on August 28, 1978, and later executed a new will in favor of his new wife. The decedent died on November 21, 1981. Her will was allowed on November 18, 1982, and the court appointed John H. Clymer as administrator with the will annexed.

What is primarily at issue in these actions is the effect of the Mayos' divorce upon dispositions provided in the dece-

---

[2] Upon the decedent's death the benefits under said policy were paid to LaFrance.

dent's will and indenture of trust. In the first action, the court-appointed administrator of the decedent's estate petitioned for instructions with respect to the impact of the divorce on the estate's administration. Named as defendants were Mayo, the decedent's parents (the Weisses), and the trustee under the indenture of trust (John P. Hill).

The second case involved a complaint for declaratory and equitable relief filed by the Weisses. Named as defendants were Hill, Mayo, Clymer, the beneficiaries named in Trust B (Hill, Michael Z. Fleming, Renee N. Watkins, LaFrance, Mary Ann Mayo, Boston University, and Clark University), James Mayo's nephews and niece (John Chamberlain, Allan Chamberlain, and Mira Hinman), and the administrators of the Boston University Retirement Plan (TIAA/CREF). The Weisses sought a declaration that the divorce revoked all gifts to Mayo set forth in the will and indenture of trust, including the power of appointment conferred upon Mayo under the trust. The Weisses also alleged that the trust was unfunded, not lawfully created, or alternatively was revoked, and therefore any purported gift to the trust had lapsed. The Weisses asked the court to set aside the trust on the grounds that Mayo and his father allegedly had engaged in fraud, deceit, undue influence, and abuse of a fiduciary relationship in its creation. Additionally, the court was asked to construe the phrase "nephews and nieces" in connection with the trust, and to order that the terms of the Mayos' divorce stipulation precluded Mayo from receiving funds from the decedent's retirement plan. Finally, the plaintiffs sought to have Hill removed as trustee.

In the third action, the Weisses petitioned the court for removal of Clymer as administrator on the ground that he had failed to exercise impartiality in his fiduciary duties.

1. *The Judge's Conclusions.*

During the consolidated trial of these actions, the judge specifically dismissed count five of the Weisses' complaint charging that Mayo and his father had fraudulently procured the execution of the decedent's will and indenture of trust. Upon reviewing the record, we agree that the Weisses failed to present any evidence to substantiate this charge and affirm the dismissal.

On November 1, 1983, the judge issued his rulings of law and dismissed the Weisses' action. The rulings that have been challenged by one or more parties on appeal are as follows: (1) the decedent's inter vivos trust, executed contemporaneously with her will, is valid under G. L. c. 203, § 3B, despite the fact that the trust did not receive funding until the decedent's death; (2) Mayo does not take under Trust A because that transfer was intended to qualify for a marital deduction for Federal estate tax purposes and this objective became impossible after the Mayos' divorce; (3) Mayo is entitled to take under Trust B because the purpose of that trust was to create a life interest in him, the decedent failed to revoke the trust provisions benefiting Mayo, and G. L. c. 191, § 9, operates to revoke only testamentary dispositions in favor of a former spouse; (4) J. Chamberlain, A. Chamberlain, and Hinman, the decedent's nephews and niece by marriage at the time of the trust's creation, are entitled to take under Trust B as the decedent's intended beneficiaries; and (5) attorney's fees totalling $43,500 are to be paid out of the decedent's estate to counsel for the petitioning parties. The Weisses also appeal the judge's November 16, 1983, dismissal of their petition to remove Clymer as administrator. The judge ruled, as a result of his earlier conclusion that the trust was valid and therefore no gift under the will had lapsed, that the Weisses lacked standing to bring a removal petition.

For the reasons to follow we affirm the judge's conclusions that: (1) the decedent established a valid trust under G. L. c. 203, § 3B; (2) Mayo's interest in Trust A was terminated as a result of the divorce; (3) the Chamberlains and Hinman are entitled to take as intended beneficiaries under Trust B, with the remainder interest to be divided equally between Clark University and Boston University; and (4) the Weisses lack standing to petition for removal of the estate's administrator. However, we reverse the judge's ruling that Mayo is to take under Trust B, and we remand the question of attorneys' fees for reconsideration.

2. *Validity of "Pour-over" Trust.*

The Weisses claim that the judge erred in ruling that the decedent's trust was validly created despite the fact that it was

not funded until her death. They rely on the common law rule that a trust can be created only when a trust res exists. *New England Trust Co.* v. *Sanger*, 337 Mass. 342, 348 (1958). Arguing that the trust never came into existence, the Weisses claim they are entitled to the decedent's entire estate as her sole heirs at law.

In upholding the validity of the decedent's pour-over trust, the judge cited the relevant provisions of G. L. c. 203, § 3B, inserted by St. 1963, c. 418, § 1, the Commonwealth's version of the Uniform Testamentary Additions to Trusts Act. "A devise or bequest, the validity of which is determinable by the laws of the commonwealth, may be made to the trustee or trustees of a trust established or to be established by the testator . . . including a funded or unfunded life insurance trust, although the trustor has reserved any or all rights of ownership of the insurance contracts, if the trust is identified in the will and the terms of the trust are set forth in a written instrument executed before or concurrently with the execution of the testator's will . . . *regardless of the existence, size or character of the corpus of the trust*" (emphasis added). The decedent's trust instrument, which was executed in Massachusetts and states that it is to be governed by the laws of the Commonwealth, satisfies these statutory conditions. The trust is identified in the residuary clause of her will and the terms of the trust are set out in a written instrument executed contemporaneously with the will. However, the Weisses claim that G. L. c. 203, § 3B, was not intended to change the common law with respect to the necessity for a trust corpus despite the clear language validating pour-over trusts, "regardless of the existence, size or character of the corpus." The Weisses make no showing of legislative intent that would contradict the plain meaning of these words. It is well established that "the statutory language is the principal source of insight into legislative purpose." *Bronstein* v. *Prudential Ins. Co. of Am.*, 390 Mass. 701, 704 (1984). Moreover, the development of the common law of this Commonwealth with regard to pour-over trusts demonstrates that G. L. c. 203, § 3B, takes on practical meaning only if the Legislature meant exactly what the statute says concerning the need for a trust corpus.

This court was one of the first courts to validate pour-over devises to a living trust. In *Second Bank-State St. Trust Co. v. Pinion*, 341 Mass. 366, 371 (1960), decided prior to the adoption of G. L. c. 203, § 3B, we upheld a testamentary gift to a revocable and amendable inter vivos trust established by the testator before the execution of his will and which he amended after the will's execution. Recognizing the importance of the pour-over devise in modern estate planning, we explained that such transfers do not violate the statute of wills despite the testator's ability to amend the trust and thereby change the disposition of property at his death without complying with the statute's formalities. "We agree with modern legal thought that a subsequent amendment is effective because of the applicability of the established equitable doctrine that subsequent acts of independent significance do not require attestation under the statute of wills." *Id.* at 369.

At that time we noted that "[t]he long established recognition in Massachusetts of the doctrine of independent significance makes unnecessary statutory affirmance of its application to pour-over trusts." *Id.* at 371. It is evident from *Pinion* that there was no need for the Legislature to enact G. L. c. 203, § 3B, simply to validate pour-over devises from wills to funded revocable trusts.

However, in *Pinion*, we were not presented with an unfunded pour-over trust. Nor, prior to G. L. c. 203, § 3B, did other authority exist in this Commonwealth for recognizing testamentary transfers to unfunded trusts. The doctrine of independent significance, upon which we relied in *Pinion*, assumes that "property was included in the purported inter vivos trust, prior to the testator's death." Restatement (Second) of Trusts § 54 comment f (1959). That is why commentators have recognized that G. L. c. 203, § 3B, "[m]akes some . . . modification of the *Pinion* doctrine. The act does not require that the trust res be more than nominal or even existent." E. Slizewski, Legislation: Uniform Testamentary Additions to Trusts Act, 1963 Ann. Survey Mass. Law § 2.7, 39. See Osgood, Pour Over Will: Appraisal of Uniform Testamentary Additions to Trusts Act, 104 Trusts 768, 769 (1965) ("The Act . . . eliminates the necessity that there be a trust corpus").

By denying that the statute effected such a change in the existing law, the Weisses render its enactment meaningless. "An intention to enact a barren and ineffective provision is not lightly to be imputed to the Legislature." *Insurance Rating Bd.* v. *Commissioner of Ins.*, 356 Mass. 184, 189 (1969). By analogy, in *Trosch* v. *Maryland Nat'l Bank*, 32 Md. App. 249, 252 (1976), the court construed Maryland's Testamentary Additions to Trusts Act as "conditionally abrogating the common law rule . . . that a trust must have a corpus to be in existence." Despite minor differences in the relevant language of Maryland's Estates and Trusts Act § 4-411,[3] and our G. L. c. 203, § 3B, we agree with the court's conclusion that "the statute is not conditioned upon the existence of a trust but upon the existence of a trust *instrument*" (emphasis in original). *Id.* at 253. The Weisses urge us to follow *Hageman* v. *Cleveland Trust Co.*, 41 Ohio App. 2d 160 (1974), rev'd on other grounds, 45 Ohio St. 2d 178, 182 (1976), where the court held that an inter vivos trust had to be funded during the settlor's life to receive pour-over assets from a will. However, in reaching this conclusion the court relied on a statute differing from G. L. c. 203, § 3B, in its omission of the critical phrase: "regardless of the existence, size or character of the corpus of the trust." See Ohio Rev. Code Ann. § 2107.63 (Baldwin 1978).

For the foregoing reasons we conclude, in accordance with G. L. c. 203, § 3B, that the decedent established a valid inter vivos trust in 1973 and that its trustee may properly receive the residue of her estate. We affirm the judge's ruling on this issue.

---

[3] Maryland Estates and Trusts Code Ann. § 4-411 (1974), reads: "A legacy may be made in form or in substance to the trustee in accordance with the terms of a written inter vivos trust, including an unfunded life insurance trust although the settlor has reserved all rights of ownership in the insurance contracts, if the trust instrument has been executed and is in existence prior to or contemporaneously with the execution of the will and is identified in the will, without regard to the size or character of the corpus of the trust or whether the settlor is the testator or a third person."

3. *Standing to Remove Administrator.*

Because a valid trust existed to receive the decedent's residuary estate, the Weisses' claim to these assets as her sole heirs at law fails. For this reason, the judge properly dismissed their petition to remove Clymer as the estate's administrator on the ground that they had no standing to prevail in such an action. General Laws c. 195, § 11, which provides for the removal of administrators for failure to perform their duties, is silent on the question of a petitioner's standing. However, in Massachusetts, as elsewhere, "[c]ourts are not established to enable parties to litigate matters in which they have no interest affecting their liberty, rights or property." *Hogarth-Swann* v. *Weed*, 274 Mass. 125, 132 (1931). As a result, only those with a legal interest in the decedent's estate, such as legatees and creditors, have standing to seek removal. *Gay* v. *Richmond*, 9 Mass. App. Ct. 334, 337 (1980). See *Estate of Richardson*, 74 Cal. App. 2d 350, 351-352 (1946); *Hogg* v. *Hogg*, 210 Ga. 809, 810 (1954).

The Weisses' reliance on *Quincy Trust Co.* v. *Taylor*, 317 Mass. 195 (1944), is misplaced. In *Quincy Trust Co.*, we were asked to reverse the removal of an executrix for "utter neglect of her duty," because the petitioner allegedly lacked standing as a creditor of the estate. *Id.* at 197. We concluded that we did not need to reach the issue of standing in light of evidence establishing the obvious unsuitability of the executrix. We stated that in such compelling circumstances the court has both a right and a duty to act sua sponte. *Id.* at 198. In this case, however, the Weisses have produced no evidence to support their charges of misconduct, nor have their briefs and arguments alleged such facts as would require the court to act on its own. Therefore, we affirm the dismissal of their petition to remove Clymer as administrator.

4. *Termination of Trust A.*

The judge terminated Trust A upon finding that its purpose — to qualify the trust for an estate tax marital deduction — became impossible to achieve after the Mayos' divorce. Mayo appeals this ruling. It is well established that the Probate Courts are empowered to terminate or reform a trust in whole or in part

where its purposes have become impossible to achieve and the settlor did not contemplate continuation of the trust under the new circumstances. *Gordon* v. *Gordon,* 332 Mass. 193, 197 (1955). *Ames* v. *Hall,* 313 Mass. 33, 37 (1943).

The language the decedent employed in her indenture of trust makes it clear that by setting off Trusts A and B she intended to reduce estate tax liability in compliance with then existing provisions of the Internal Revenue Code. Therefore we have no disagreement with the judge's reasoning. See *Putnam* v. *Putnam,* 366 Mass. 261, 267 (1974). However, we add that our reasoning below — that by operation of G. L. c. 191, § 9, Mayo has no beneficial interest in the trust — clearly disposes of Mayo's claim to Trust A.

5. *Mayo's Interest in Trust B.*

The judge's decision to uphold Mayo's beneficial interest in Trust B was appealed by the Weisses, as well as by Boston University and Clark University. The judge reasoned that the decedent intended to create a life interest in Mayo when she established Trust B and failed either to revoke or to amend the trust after the couple's divorce. The appellants argue that we should extend the reach of G. L. c. 191, § 9, to revoke all Mayo's interests under the trust.[4] General Laws c. 191, § 9, as amended through St. 1977, c. 76, § 2, provides in relevant part: "If, after executing a will, the testator shall be divorced or his marriage shall be annulled, the divorce or annulment shall revoke any disposition or appointment of property made by the will to the former spouse, any provision conferring a general or special power of appointment on the former spouse, and any nomination of the former spouse, as executor, trustee, conservator or guardian, unless the will shall expressly provide otherwise. Property prevented from passing to a former spouse because of a revocation by divorce shall pass as if a former spouse had failed to survive the decedent, and other provisions conferring a power of office on the former spouse shall be interpreted as if the spouse had failed to survive

---

[4] None of the parties contests the judge's ruling that G. L. c. 191, § 9, revokes those provisions in the decedent's will which benefited Mayo.

the decedent." The judge ruled that Mayo's interest in Trust B is unaffected by G. L. c. 191, § 9, because his interest in that trust is not derived from a "disposition . . . made by the will" but rather from the execution of an inter vivos trust with independent legal significance. We disagree, but in fairness we add that the judge here confronted a question of first impression in this Commonwealth.

General Laws c. 191, § 9, was amended by the Legislature in 1976 to provide in the event of divorce for the revocation of testamentary dispositions which benefit the testator's former spouse. St. 1976, c. 515, § 6. The statute automatically causes such revocations unless the testator expresses a contrary intent. In this case we must determine what effect, if any, G. L. c. 191, § 9, has on the former spouse's interest in the testator's pour-over trust.

While, by virtue of G. L. c. 203, § 3B, the decedent's trust bore independent significance at the time of its creation in 1973, the trust had no practical significance until her death in 1981. The decedent executed both her will and indenture of trust on February 2, 1973. She transferred no property or funds to the trust at that time. The trust was to receive its funding at the decedent's death, in part through her life insurance policy and retirement benefits, and in part through a pour-over from the will's residuary clause. Mayo, the proposed executor and sole legatee under the will, was also made the primary beneficiary of the trust with power, as to Trust A only, to reach both income and principal.

During her lifetime, the decedent retained power to amend or revoke the trust. Since the trust was unfunded, her cotrustee was subject to no duties or obligations until her death. Similarly, it was only as a result of the decedent's death that Mayo could claim any right to the trust assets. It is evident from the time and manner in which the trust was created and funded, that the decedent's will and trust were integrally related components of a single testamentary scheme. For all practical purposes the trust, like the will, "spoke" only at the decedent's death. For this reason Mayo's interest in the trust was revoked by operation of G. L. c. 191, § 9, at the same time his interest under the decedent's will was revoked.

It has reasonably been contended that in enacting G. L. c. 191, § 9, the Legislature "intended to bring the law into line with the expectations of most people . . . . Divorce usually represents a stormy parting, where the last thing one of the parties wishes is to have an earlier will carried out giving everything to the former spouse." Young, Probate Reform, 18 B.B.J. 7, 11 (1974). To carry out the testator's implied intent, the law revokes "any disposition or appointment of property made by the will to the former spouse." It is indisputable that if the decedent's trust was either testamentary or incorporated by reference into her will, Mayo's beneficial interest in the trust would be revoked by operation of the statute. However, the judge stopped short of mandating the same result in this case because here the trust had "independent significance" by virtue of c. 203, § 3B. While correct, this characterization of the trust does not end our analysis. For example, in *Sullivan v. Burkin*, 390 Mass. 864, 867 (1984), we ruled prospectively that the assets of a revocable trust will be considered part of the "estate of the decedent" in determining the surviving spouse's statutory share.

Treating the components of the decedent's estate plan separately, and not as parts of an interrelated whole, brings about inconsistent results. Applying c. 191, § 9, the judge correctly revoked the will provisions benefiting Mayo. As a result, the decedent's personal property — originally left to Mayo — fell into the will's residuary clause and passed to the trust. The judge then appropriately terminated Trust A for impossibility of purpose thereby denying Mayo his beneficial interest under Trust A. Yet, by upholding Mayo's interest under Trust B, the judge returned to Mayo a life interest in the same assets that composed the corpus of Trust A — both property passing by way of the decedent's will and the proceeds of her TIAA/CREF annuity contracts.

We are aware of only one case concerning the impact of a statute similar to G. L. c. 191, § 9, on trust provisions benefiting a former spouse. In *Miller* v. *First Nat'l Bank & Trust Co.*, 637 P.2d 75 (Okla. 1981), the testator also simultaneously executed an indenture of trust and will naming his spouse as

primary beneficiary. As in this case, the trust was to be funded at the testator's death by insurance proceeds and a will pour-over. Subsequently, the testator divorced his wife but failed to change the terms of his will and trust. The District Court revoked the will provisions favoring the testator's former wife by applying a statute similar to G. L. c. 191, § 9.[5] Recognizing that "[t]he will without the trust has no meaning or value to the decedent's estate plan," the Oklahoma Supreme Court revoked the trust benefits as well. *Id.* at 77. However, we do not agree with the court's reasoning. Because the Oklahoma statute, like G. L. c. 191, § 9, revokes dispositions of property made by will, the court stretched the doctrine of incorporation by reference to render the decedent's trust testamentary. We do not agree that reference to an existing trust in a will's pour-over clause is sufficient to incorporate that trust by reference without evidence that the testator intended such a result. See *Second Bank-State St. Trust Co.* v. *Pinion*, 341 Mass. 366, 367 (1960). However, it is not necessary for us to indulge in such reasoning, because we have concluded that the legislative intent under G. L. c. 191, § 9, is that a divorced spouse should not take under a trust executed in these circumstances. In the absence of an expressed contrary intent, that statute implies an intent on the part of a testator to revoke will provisions favoring a former spouse. It is incongruous then to ignore that same intent with regard to a trust funded in part through her will's pour-over at the decedent's death.[6] See *State St. Bank & Trust* v. *United States*, 634 F.2d 5, 10 (1st Cir. 1980) (trust should be interpreted in light of settlor's contemporaneous

---

[5] Oklahoma Stat. tit. 84, § 114 (1982), states in part: "If, after making a will, the testator is divorced, all provisions in such will in favor of the testator's spouse so divorced are thereby revoked."

[6] Although we need not and do not rely on it, we note that extraneous evidence received by the judge regarding the deteriorating relationship between the decedent and Mayo during the years following the execution of her trust and before her death is consistent with the result we have reached. This evidence included the terms of the Mayos' divorce settlement, the decedent's stated desire to draw up a new will after her divorce, her comments to friends expressing relief that her marriage had ended, and frictions developing between the Mayos as a result of his remarriage.

execution of interrelated will). As one law review commentator has noted, "[t]ransferors use will substitutes to avoid probate, not to avoid the subsidiary law of wills. The subsidiary rules are the product of centuries of legal experience in attempting to discern transferors' wishes and suppress litigation. These rules should be treated as presumptively correct for will substitutes as well as for wills." Langbien, The Nonprobate Revolution and the Future of the Law of Succession, 97 Harv. L. Rev. 1108, 1136-1137 (1984).

Restricting our holding to the particular facts of this case — specifically the existence of a revocable pour-over trust funded entirely at the time of the decedent's death — we conclude that G. L. c. 191, § 9, revokes Mayo's interest under Trust B.[7]

6. *Nephews and Nieces of Donor.*

According to the terms of G. L. c. 191, § 9, "[p]roperty prevented from passing to a former spouse because of revocation by divorce shall pass as if a former spouse had failed to survive the decedent . . . ." In this case, the decedent's indenture of trust provides that if Mayo failed to survive her, "the balance of 'Trust B' shall be held . . . for the benefit of the nephews and nieces of the Donor living at the time of the death of the Donor." The trustee is directed to expend as much of the net income and principal as he deems "advisable for [their] reasonable comfort, support and education" until all living nephews and nieces have attained the age of thirty. At that time, the trust is to terminate and Boston University and Clark University are each to receive fifty per cent of the trust property to assist women students in their graduate programs.

---

[7] As an alternative ground the appellants argue that the terms of the Mayos' divorce settlement, in which Mayo waived "any right, title or interest" in the assets that later funded the decedent's trust, amount to a disclaimer of his trust interest. We decline to base our holding on such reasoning because a disclaimer of rights "must be clear and unequivocal." *Second Bank-State St. Trust Co.* v. *Yale Univ. Alumni Fund,* 338 Mass. 520, 524 (1959), and we find no such disclaimer in the Mayos' divorce agreement.

The decedent had no siblings and therefore no nephews and nieces who were blood relations.[8] However, when she executed her trust in 1973, her husband, James P. Mayo, Jr., had two nephews and one niece — John and Allan Chamberlain and Mira Hinman. Before her divorce, the decedent maintained friendly relations with these young people and, along with her former husband, contributed toward their educational expenses. The three have survived the decedent.

The Weisses, Boston University, and Clark University appeal the decision of the judge upholding the decedent's gift to these three individuals. They argue that at the time the decedent created her trust she had no "nephews and nieces" by blood and that, at her death, her marital ties to Mayo's nephews and niece had been severed by divorce. Therefore, they contend that the class gift to the donor's "nephews and nieces" lapses for lack of identifiable beneficiaries.

The judge concluded that the trust language created an ambiguity, and thus he considered extrinsic evidence of the decedent's meaning and intent. Based upon that evidence, he decided that the decedent intended to provide for her nieces and nephews by marriage when she created the trust. Because the decedent never revoked this gift, he found that the Chamberlains and Hinman are entitled to their beneficial interests under the trust. We agree.

The appellants claim that no ambiguity is presented by the decedent's gift to her "nephews and nieces" and therefore the judge erred in considering extrinsic evidence of the meaning of this phrase. It is axiomatic that "[t]he intent of the testator governs the interpretation of his will." *Sullivan* v. *Roman Catholic Archbishop of Boston*, 368 Mass. 253, 257 (1975). See G. L. c. 191, § 1A. It is equally well established that we "ascertain the intention of the testator from the whole instrument, attributing due weight to all its language, considered in the light of the circumstances known to him at the time of its

---

[8] Considering the ages of all concerned, it could not reasonably be argued that the decedent might have contemplated the possibility of siblings to be born after the trust was executed.

execution and to give effect to that intent unless some positive rule of law forbids." *Fitts* v. *Powell*, 307 Mass. 449, 454 (1940). *Gustafson* v. *Svenson*, 373 Mass. 273, 275 (1977). Where "a reading of the whole will produces a conviction that the testator must necessarily have intended an interest to be given which is not bequeathed or devised by express or formal words, the court must supply the defect by implication and so mould the language of the testator as to carry into effect as far as possible the intention which it is of opinion that he has sufficiently declared." *Fitts, supra.*

The judge was thus well within his discretion in considering the facts and circumstances known to the decedent at the time she executed her indenture of trust. The purpose of his inquiry was not to alter but to explain the language of the trust. Extrinsic evidence is admissible for this purpose even where no ambiguity is presented. Smith, The Admissibility of Extrinsic Evidence in Will Interpretation Cases, 64 Mass. L. Rev. 123 (1979). In fact, however, the decedent's bequest created a latent ambiguity. The gift to the "nephews and nieces of the Donor" posed problems in the identification of the intended donees. See *Putnam* v. *Putnam*, 366 Mass. 261, 266 (1974); *Hardy* v. *Smith*, 136 Mass. 328 (1884); *Dane* v. *Walker*, 109 Mass. 179 (1872). The relevant evidence included the decedent's lack of siblings, her relationship to Mayo's nephews and niece, and her contributions to their education. Combining these facts with the language used by the decedent, it is clear that the Chamberlains and Hinman were her intended beneficiaries.

The appellants argue that *Goddard* v. *Amory*, 147 Mass. 71 (1888), mandates a different result. In *Goddard*, we held that the wives of the testatrix's blood nephews were not entitled to a share of trust income left to her "nephews and nieces." We noted that the usual legal meaning of "nephews and nieces" is the children of one's siblings. However, the court did not end its analysis there. Instead, we inquired into the intent of the testatrix as indicated by the will as a whole, and the circumstances existing at the time of its execution. Because the testatrix left brothers "and it was possible that one of them

might have a daughter or daughters born to him," we concluded that "the use of the word 'nieces' was necessary in order to insure an equality among her blood relations in equal degree." *Id.* at 75. This conclusion was further supported by the general intent shown by the will to leave property to blood relatives. *Id.* In distinction, by leaving an interest in Trust B to her "nephews and nieces" the decedent could only have meant her nephews and nieces by marriage. Moreover, neither her will nor trust leaves any of her property to blood relatives. Equally inapposite is *Hyatt* v. *Jurczyk*, 368 F.2d 546 (1st Cir. 1966). There, the court rightly refused to admit parol evidence, consisting of the declared intention of the testatrix, being offered to change the language of the will. Here evidence of the decedent's relationship to Mayo's nephews and nieces was admitted to explain, not alter, the trust language.

The judge's ruling is supported by *Wittmer Estate*, 151 Pa. Super. 274 (1942). In that case, the testator left a share of his estate to "my surviving nephews and nieces." As in this case, the testator had only nephews and nieces by marriage. As a result of this latent ambiguity, the court concluded that extrinsic evidence was admissible to identify the intended beneficiaries. Similarly, in *Sulzbacher's Estate*, 169 Misc. 1 (N.Y. Surrogate's Ct. 1938), and in *Platt's Estate*, 147 N.Y.S. 2d 716, 718 (N.Y. Sur. Ct. 1955), devises to "nephews and nieces" were held to extend beyond blood relatives. "The words 'nieces and nephews' in their primary and usual sense denote a blood relationship but the significance of these words may be enlarged and their definition may be altered in their employment by a particular testator." *Id.* at 718. "[W]hen words are descriptive of a class of beneficiaries, their scope and application may . . . be enlarged or restricted as may best comport with the evident intention and purpose of the testator." *Id.*

The appellants reject these authorities on the ground that the Mayos' divorce left the decedent without *any* nephews and nieces — by blood or marriage — at the time of her death. They argue that even if the decedent had intended to provide for the Chamberlains and Hinman when she executed her indenture of trust, we should rule that the Mayos' divorce somehow

"revoked" this gift. According to Boston University, since the beneficiaries are identified by their relationship to the decedent through her marriage and not by name, we should presume that the decedent no longer intended to benefit her former relatives once her marriage ended. General Laws c. 191, § 9, does not provide the authority for revoking gifts to the blood relatives of a former spouse. The law implies an intent to revoke testamentary gifts between the divorcing parties because of the profound emotional and financial changes divorce normally engenders. There is no indication in the statutory language that the Legislature presumed to know how these changes affect a testator's relations with more distant family members. We therefore conclude that the Chamberlains and Hinman are entitled to take as the decedent's "nephews and nieces" under Trust B.

7. *Attorney's Fees.*

Pursuant to G. L. c. 215, § 39B,[9] the judge ordered payment out of the decedent's estate of counsel fees totaling $43,500. Although his order was not accompanied by findings or rulings, we conclude, in light of the representations of the parties and the established law, that the judge did not take into consideration all relevant criteria in determining his fee award.

An important factor in assessing the reasonableness of fees awarded in probate cases is the size of the estate. See *McMahon* v. *Krapf*, 323 Mass. 118, 123 (1948); *Cummings* v. *National Shawmut Bank*, 284 Mass. 563, 569 (1933). It is a long-standing principle that the judge is to "take into consideration . . . the amount in controversy, and . . . prevent the fund from being either entirely or in great part absorbed by counsel fees." *Frost* v. *Belmont*, 6 Allen 152, 165 (1863). Accordingly, we

---

[9] General Laws c. 215, § 39B, as appearing in St. 1975, c. 400, § 70, states in relevant part: "When a judgment or decree is entered in a contested proceeding seeking equitable relief or on an account or to determine the construction of a will or of any trust instrument . . ., the probate court may, in its discretion as justice and equity may require, provide that such sums as said court may deem reasonable be paid out of the estate . . . to any party to the proceeding on account of counsel fees and other expenses incurred by him in connection therewith."

have stated that where fees are paid to counsel "who may not have been employed by those whose estates are thus diminished" they are to be awarded on "strictly conservative principles." *Holyoke Nat'l Bank* v. *Wilson*, 350 Mass. 223, 230 (1966), quoting *Hayden* v. *Hayden*, 326 Mass. 587, 596 (1950). An excessive fee award may itself defeat the decedent's intent by depleting her estate.

According to the testimony of the court-appointed administrator, John Clymer, the value of the decedent's "adjusted gross estate," i.e., undiminished by any estate or inheritance taxes or other governmental charges, stood at approximately $249,000 at the time of the fee award. He stated that he arrived at this estimate after deducting various administrative expenses, as well as counsel fees for the fiduciaries.[10] Assuming that Mayo did not take under the trust, Clymer estimated that the balance of Trust B, after taxes and additional payments, would amount to approximately $100,000.[11] Out of that $100,000, all other attorneys' fees would have to be paid.

Additional factors for the judge to consider include the merits of the claims raised, the benefit the litigation has rendered to the administration of the estate, and the degree to which the various parties have succeeded in their claims. See *Ronan* v. *Naumkeag Trust Co.*, 361 Mass. 892 (1972); *First Nat'l Bank* v. *Sullivan*, 4 Mass. App. Ct. 414, 423 (1976).

We vacate the judge's order and remand the fee awards for all services, including appellate proceedings, for reconsideration in light of the factors discussed above, and other relevant considerations. See G. L. c. 215, § 39B. Given the attention the parties have paid to the issue of counsel fees, it would be advisable for the judge to accompany his order with appropriate findings indicating his reasoning.

In sum, we conclude that the decedent established a valid trust under G. L. c. 203, § 3B; Mayo's beneficial interest in

---

[10] The judge awarded counsel fees of $3,200 to Mira Hinman's guardian ad litem, $4,650 to John Clymer, and $3,000 to the attorney for trustee John Hill.

[11] The record offers us no details as to the estimated diminution from $249,000 to $100,000.

Trust A and Trust B is revoked by operation of G. L. c. 191, § 9; the Chamberlains and Hinman are entitled to take the interest given to the decedent's "nephews and nieces" under Trust B, leaving the remainder to Clark University and Boston University; the Weisses lack standing to remove the estate administrator; and the judge's award of attorneys' fees is vacated and remanded for reconsideration.

*So ordered.*