The **EQUITABLE LIFE ASSURANCE SOCIETY OF THE UNITED STATES**, Plaintiff, Appellee,

v.

Sandra **PORTER–ENGLEHART**, et al., Defendants.

Sandra **Porter–Englehart**, Defendant, Appellant.

No. 88–1683.

United States Court of Appeals, First Circuit.

Heard Dec. 9, 1988.

Decided Feb. 8, 1989.

Denis Frauenhofer, for appellant.

Hrant H. Russian, Cambridge, Mass., for defendants-appellees Merle Joy Englehart, individually and as Trustee under the Last Will and Testament of Manfred O. Englehart, John O. Englehart, William L. Englehart, Andrew D. Englehart and Colleen A. Englehart.

Donald R. Peck, with whom David R. Schmahmann and Nutter, McClennen & Fish, Boston, Mass., were on brief, for appellee Equitable Life Assur. Soc. of the U.S.

Before BOWNES, BREYER and SELYA, Circuit Judges.

SELYA, Circuit Judge.

Like William Shakespeare's account of King Ferdinand of Navarre and his much-befuddled lords, this too is a case of "Love's Labour's Lost." But unlike the Princess of France, we do not enjoy the luxury of consigning suitors to some forlorn and naked hermitage whilst we postpone our answer for a twelvemonth and a day. The tale which confronts us, and our resolution of it, follows. The parties, agreeing on little else, acknowledge that the substantive law of Massachusetts controls.

## I. WHERE THERE'S A WILL

The underlying controversy pits first wife against second in a rancorous internecine struggle within the family Englehart. The paterfamilias, Manfred Owen Engle-

hart, Jr., was a mathematician employed by Factory Mutual Engineering Corporation (FM). He and his first wife, Merle, had four children before they were divorced on July 24, 1969. Notwithstanding the divorce, Manfred executed a last will and testament (Will) in December 1973, bequeathing his residuary estate to Merle as trustee for their children. The Will (excerpted in relevant part in the appendix hereto) delineated the terms and conditions of the trust.

In or about February 1974, FM extended group insurance coverage to Manfred under a pair of policies issued by the Equitable Life Assurance Society of the United States (Equitable): Group Life Policy No. 3738 and Group Accidental Death and Dismemberment Policy No. 3738D. Each policy contained a promise to pay $69,000 in the event of a "covered" death. The employee was given the right to name the beneficiaries. On October 18, 1974, Manfred married Sandra Porter–Englehart. They settled in Newton, Massachusetts. The marriage was bereft of issue, but under Mass.Gen.L. ch. 191, § 9, it revoked the Will.[1] From aught that appears of record, Manfred knew nothing of the statute or of its effect. He executed no new will.

On January 28, 1976, Manfred inserted identical beneficiary designations in the two insurance policies, to wit:

Pay 70% of the proceeds of this policy to the Trustee named in my Last Will and Testament. Pay 30% of the proceeds to my wife, Sandra Porter–Englehart. If there is no Last Will and Testament or if either portion is unclaimed after one year from the date of death, pay any unclaimed portion to my estate.

Within six months, tragedy struck. Manfred was killed in a traffic accident. The policies afforded coverage.

## II. COURTSHIP OF A SORT

Equitable paid Sandra her 30% share of the group life proceeds on August 15, 1980. It did not pay over the 30% share of the

accidental death benefit at that time. Instead of making further disbursements, Equitable brought the instant interpleader action. The complaint alleged that the remaining insurance proceeds were subject to conflicting claims: Merle contended that a 70% share under each policy should be paid to her as trustee for the children, in pursuance of the beneficiary designations; Sandra argued that these sums should be paid into Manfred's estate (of which she was administratrix), to pass through intestacy, since remarriage had invalidated the 1973 Will and therefore, in her view, vitiated the beneficiary designations. Contemporaneous with the start of suit, Equitable deposited into the district court's registry $117,300—an amount representing the residual 70% of the life policy and the entire value of the accidental death policy. The protagonists answered the complaint, and Sandra counterclaimed against Equitable for unfair practices.

Because no one contended that material facts were in dispute anent entitlement, disposition of the merits under Fed.R.Civ.P. 56 appeared appropriate. The parties cross-moved for summary judgment. The district court awarded Sandra the 30% share of the accidental death policy, finding that her right to that money was not in fact contested. *Equitable Life Assurance Soc'y of the United States v. Porter–Englehart*, No. 80–2586–N (D.Mass. Apr. 12, 1985) (the April 12 Order). In a subsequent decision, the district court found "no indication of bad faith" on the insurer's part, granted judgment for Equitable on Sandra's counterclaims, ordered its fees paid, and dismissed it from the action. *Equitable Life Assurance Soc'y of the United States v. Porter–Englehart*, No. 80–2586–N (D.Mass. May 30, 1985) (the May 30 Order).

The district court issued its endmost opinion on May 31, 1988. *Equitable Life Assurance Soc'y of the United States v. Porter–Englehart*, No. 80–2586–N (D.Mass. May 31, 1988) (D.Ct.Op.). The

---

1. In relevant part, the statute provides:
 The marriage of a person shall act as a revocation of a will made by him previous to such marriage, unless it appears from the will that it was made in contemplation thereof. Mass.Gen.L. ch. 191, § 9.

court ruled that the 1973 Will, although legally revoked by Manfred's remarriage, nonetheless sufficed to create a valid nontestamentary trust when read in conjunction with the policies' beneficiary designations. *Id.* at 5. The court noted that Manfred was already married to Sandra— and the Will thus dysfunctional—when he drafted the designations. Since Manfred "surely would not have created a void designation *ab initio*," *id.* at 7, the judge interpreted the phrase "[i]f there is no will" to mean "if the will is non-existent," not "if the will is incapable of being probated." *Id.* Accordingly, Sandra's motion for summary judgment was denied and Merle's was allowed. Sandra appealed.

## III. THE NEED TO INTERPLEAD

The district court found that it had jurisdiction under 28 U.S.C. § 1335.[2] Sandra concedes that she and Merle (an Oregonian) are of diverse citizenship and that their claims apparently conflict. She urges, however, that the district court should have declined to hear the case because Merle's proper remedy lay in probate court; and asserts, alternatively, that Merle's claims are frivolous and thus not truly adverse. To resolve these, and other, matters we must shake the dust from a number of the frowstier opinions of the Massachusetts Supreme Judicial Court (SJC).

### A.

■ It is hornbook law that a life insurance policy "is not a will but a contract entered into between the insured on one side, and the insurance company...." *Davis v. New York Life Ins. Co.*, 212 Mass. 310, 312, 98 N.E. 1043 (1912). The policy proceeds are to be paid to the beneficiary designated therein. "Manifestly money so paid does not pass 'by will, or by the laws

regulating intestate succession.'" *Tyler v. Treasurer and Receiver General*, 226 Mass. 306, 307, 115 N.E. 300 (1917) (quoting Massachusetts tax laws). It follows, then, that satisfying the beneficiary is the contractual responsibility of the insurer, not the fiduciary responsibility of the administratrix. *See* 5 M. Rhodes, *Couch on Insurance 2d* § 29:26 (Rev. ed. 1984); *cf. Gould v. Emerson*, 99 Mass. 154, 157 (1868) (life insurance benefits not considered to be general assets in hands of administrator). Here, contract law will determine whether the proceeds belong to the estate or to the named trustee. Given that the case slips neatly within the section 1335 integument, the district court, we believe, was wholly competent to hear and determine the question.

The precedents cited by appellant do not speak for a contrary proposition. They hold only that federal courts should dismiss interpleader actions when federal adjudication would disrupt ongoing state proceedings—a concept with which we can readily agree. *See, e.g., Home Indemnity Co. v. Moore*, 499 F.2d 1202, 1205 (8th Cir.1974); *Koehring Co. v. Hyde Construction Co.*, 424 F.2d 1200, 1205 (7th Cir.1970); *Equitable Life Assurance Soc'y v. Cooper*, 328 F.Supp. 1126, 1127 (W.D.Okla.1971). Yet, the case at bar is at a sizable remove: since life insurance policies must be paid directly to the designated beneficiary rather than distributed through the probate estate, a federal declaration concerning such proceeds in no way interferes with the work of the probate court. By asserting that the money should be paid to the estate so that the administratrix may determine who receives it, appellant begs the threshold question of the estate's entitlement.

---

**2.** The interpleader statute provides in pertinent part:

(a) The district courts shall have original jurisdiction of any civil action of interpleader ... filed by any ... corporation, association, or society ... having issued a ... policy of insurance, or other instrument of value or amount of $500 or more ... if

(1) Two or more adverse claimants, of diverse citizenship ... are claiming or may

claim to be entitled to ... any one or more of the benefits arising by virtue of any ... policy or other instrument, or arising by virtue of any such obligation; and if (2) the plaintiff has deposited ... the amount due under such obligation into the registry of the court, there to abide the judgment of the court....

28 U.S.C. § 1335(a).

### B.

■ Sandra's second argument strikes us as bizarre. The fact that the district court, after due deliberation, awarded the 70% shares to Merle seems irrefutable evidence that the trustee's claims, whether or not successful on appeal, are far from frivolous. After all, to support an interpleader action, the adverse claims need attain only "a minimal threshold level of substantiality." 7 C. Wright, A. Miller, & M. Kane, *Federal Practice and Procedure* § 1704 (2d ed. 1986) at 504 (footnote omitted). "[I]t is immaterial whether the stakeholder believes that all claims against the fund are meritorious. Indeed, in the usual case, at least one of the claims will be very tenuous." *Id.* (footnote omitted). The threat of possible multiple litigation—not necessarily the likelihood of duplicative liability—justifies resort to interpleader. *See, e.g., Underwriters at Lloyd's v. Nichols,* 363 F.2d 357, 365 (8th Cir.1966) (interpleader statute designed not only to protect stakeholders from multiple liability but also to save them from expense of multiple litigation). These are unexacting standards— and Merle's offering clears the jurisdictional bar with room to spare.[3]

### IV. A MATTER OF TRUST

■ Manfred's intent is not legitimately in issue. The district court found, and appellant's counsel admits, that the decedent wanted 70% of the aggregate insurance benefits held in trust for his children. *See* D.Ct.Op. at 8. Appellant does not quibble over Manfred's wishes, but argues only that his actions were legally impuissant to effectuate them. In her view, the beneficiary designations were testamentary, ergo void, because they relied upon the provisions of a Will which, in contemplation of law, had been revoked. This theory, though superficially appealing, cannot withstand scrutiny.

Life insurance policies may create valid trusts. Such trusts are *inter vivos* rather than testamentary, because they pass present interests created by contract. *See Legro v. Kelley,* 311 Mass. 674, 676–77, 42 N.E.2d 836 (1942) ("nothing in the statute of wills ... prevents the creation by contract of a bona fide equitable interest in property and its enforcement after the death of a contracting party, even though the date of death is agreed upon as the time for transfer of the legal title"); *Resnek v. Mutual Life Ins. Co.,* 286 Mass. 305, 308, 190 N.E. 603 (1934) (interest of designated beneficiary of life insurance policy described as "a qualified vested interest, which is subject to be divested and defeated should the assured in his lifetime exercise the power given him to change a beneficiary in the manner prescribed by the contract between the insurer and the assured"); *see also National Shawmut Bank v. Joy,* 315 Mass. 457, 471, 53 N.E.2d 113 (1944) (so long as interest passes from owner presently, while owner remains alive, transfer is not testamentary). As the SJC observed long ago:

> The rights of the beneficiary [of life insurance] are vested when the designation is made in accordance with the terms of the contract of insurance. They take complete effect as of that time. They do not wait for their efficacy upon the happening of a future event. They are in no wise modified or increased at the time of the death of the insured.

*Tyler,* 226 Mass. at 308, 115 N.E. 300. *See generally* Restatement (Second) of Trusts § 57 comment f & § 84 comment b (1959).

In Massachusetts, "the existence of a trust does not depend upon the terminology used." *Carpenter v. Suffolk Franklin Savings Bank,* 362 Mass. 770, 777, 291

---

**3.** Appellant's jurisdictional objection vis-a-vis the 30% share of the accidental death policy is equally puzzling. In the April 12 Order, the district judge found Sandra entitled to these funds. Notwithstanding this favorable ruling, she continues to challenge the court's jurisdiction to adjudicate ownership. Nothing turns on the effort: if we were to find that interpleader as to the 30% share was frivolous, and therefore were to conclude that the district court lacked jurisdiction over that aspect, the remedy would be to vacate the April 12 Order awarding the money to Sandra and to insist that Sandra return the money to the registry, so that Equitable could withdraw it, and then pay it to Sandra. Such an elaborate game of ring-around-the-rosy seems utterly pointless. As to the 30%, the jurisdictional question is moot.

N.E.2d 609 (1973) (quoting *Gordon v. Gordon,* 332 Mass. 193, 195, 124 N.E.2d 226 (1955)). Instead, "[w]hether a trust was created depends upon the intention of the parties 'manifested by their words and conduct and the end to be accomplished.'" *Carpenter,* 362 Mass. at 777, 291 N.E.2d 609 (quoting *Povey v. Colonial Beacon Oil Co.,* 294 Mass. 86, 90, 200 N.E. 891 (1936)). *Accord In re Pilot Radio & Tube Corp.,* 72 F.2d 316, 319 (1st Cir.), *cert. denied,* 293 U.S. 584, 55 S.Ct. 98, 79 L.Ed. 680 (1934); *Rugo v. Rugo,* 325 Mass. 612, 616, 91 N.E.2d 826 (1950); *see generally* 5 M. Rhodes, *supra,* § 29:41. Put another way: "No particular form of words is required to create a trust. But whether one exists or not is to be ascertained from the intention of the parties." *Sawyer v. Cook,* 188 Mass. 163, 165, 74 N.E. 356 (1905).

The requisites of a trust may be discovered when several documents of various sorts are read in conjunction and construed in light of all the surrounding circumstances. In the Commonwealth, it has been settled since the presidency of James Monroe that "letters or other papers, however informal, are sufficient to constitute [a] declaration [of trust]." *Barrell v. Joy,* 16 Mass. 220, 222 (1819). *See also Herman v. Edington,* 331 Mass. 310, 315, 118 N.E.2d 865 (1954) (writing on envelope, when construed with deeds inside envelope, created express trust in lands conveyed); *Cohen v. Newton Savings Bank,* 320 Mass. 90, 93, 67 N.E.2d 748 (1946) (writing on back of bank account card established trust); *Stratton v. Edwards,* 174 Mass. 374, 377, 54 N.E. 886 (1899) (wife's written statement, read in conjunction with separate letter to mother, constituted "valid and sufficient declaration of trust"); *Urann v. Coates,* 109 Mass. 581, 584 (1872) (decedent's memorandum of debts established testamentary trust). The same relaxed standard holds true for the creation of trusts by contract, including policies of insurance. As the SJC has phrased it: "Whether a trust is created by a contract is to be ascertained by the words used in that contract or by the terms of that contract, however phrased, which show in the light of the surrounding circumstances that the parties intended by the executed instrument to create an express trust in furtherance of the object sought to be attained." *Becker v. Dutton,* 269 Mass. 320, 324, 168 N.E. 804 (1929); *see also Montague v. Hayes,* 76 Mass. (10 Gray) 609, 611 (1858) (letter contract created trust); *Arms v. Ashley,* 21 Mass. (4 Pickering) 71, 73 (1827) (personal contract sufficient to establish trust).

Particularly instructive for our purposes is a turn-of-the-century case, *Kendrick v. Ray,* 173 Mass. 305, 53 N.E. 823 (1899). There, the decedent (Kendrick) purchased a life insurance policy and made it payable to "Edward A. Taft, trustee." The designation did not describe the supposed trust or its terms. Taft had no knowledge of any insurance or trust. Upon Kendrick's death, however, a sealed letter was found inside his desk. That missive, addressed to Taft, instructed the latter to "pay over in case of my death any money collected by you as trustee on any policies of insurance on my life to Mrs. Thomas J. Smith, Hotel Pelham." The mysterious Mrs. Smith, thought by some to be decedent's inamorata, had been told by Kendrick that she was the beneficiary of his life insurance and should see Taft about the matter if Kendrick died. *Id.* at 307–08, 53 N.E. 823. The SJC recognized that, "[f]or the purpose of showing who was the beneficiary, and what the terms of the trust were, evidence of the declarations oral and written of the donor w[as] admissible" to amplify the cryptic designation contained in the policy. *Id.* at 308, 53 N.E. 823. In conjunction with the designation, that evidence—the sealed letter and Kendrick's statements to Mrs. Smith—was sufficient to prove the essential elements of a trust. *Id.* at 309, 53 N.E. 823. In other words, the trust provisions in the letter were ruled to have been incorporated by reference into the beneficiary designation, rendering the designation complete and enforceable. *Id.*

*Kendrick* is not an anomaly. Incorporation by reference is an accepted device in the law of trusts and estates. *See, e.g., Bemis v. Fletcher,* 251 Mass. 178, 186–88, 146 N.E. 277 (1925) (when wife left proper-

ty upon terms "as shall be provided for the trust established by my said husband's will relating to the residue of his estate," wife's will established a valid " 'referential' trust ... separate and distinct from the trust fund created by her husband"); *Newton v. Seaman's Friend Society,* 130 Mass. 91, 93 (1881) ("If a will, executed and witnessed as required by statute, incorporates in itself by reference any document or paper not so executed and witnessed, whether the paper referred to be in the form of a will or codicil, or of a deed or indenture, or of a mere list or memorandum, the paper so referred to, if it was in existence at the time of the execution of the will, and is identified by clear and satisfactory proof as the paper referred to therein, takes effect as part of the will, and should be admitted to probate as such."); *see also Clymer v. Mayo,* 393 Mass. 754, 761, 473 N.E.2d 1084 (1985); *Second Bank–State Street Trust Co. v. Pinion,* 341 Mass. 366, 371, 170 N.E.2d 350 (1960).

The facts before the district court parallel those cases in which a preexisting trust was incorporated by reference into a will. The result should logically be the same. Manfred's beneficiary designation must be read to incorporate the pertinent provisions of the Will, thereby limning the terms of the trust. After all, the Will had been executed more than a year prior to the crafting of the beneficiary designations and "was in existence at the time of the [policy's] execution," *Newton,* 130 Mass. at 93; it was "sufficiently identified" in the text of the designations, *Bemis,* 251 Mass. at 186, 146 N.E. 277; and, like the sealed letter to the unknowing Taft, it provided ample evidence of the trust terms, *Kendrick,* 173 Mass. at 308–09, 53 N.E. 823.[4] The effect of incorporation in this case is simply to recognize that Manfred created an *inter vivos* life insurance trust having the same terms as his testamentary trust, but separate and distinct therefrom. The Massachusetts cases teach that such an *inter vivos* trust is valid and enforceable. *See, e.g., Bemis,* 251 Mass. at 188, 146 N.E. 277.

Our conclusion derives support from our own precedent. In *Boston Safe Deposit & Trust Co. v. Commissioner of Internal Revenue,* 100 F.2d 266 (1st Cir.1938), the decedent purchased life insurance policies payable to the plaintiff as trustee, without specifying the trust's beneficiaries. But decedent had established a trust for the benefit of his wife and children in his will and had named the same institution as custodian of that trust. Relying upon provisions of the testamentary trust to flesh out the language of the policies' beneficiary designations, we concluded that the insurance proceeds should be held under the selfsame terms:

> [T]he decedent, by the provisions contained in the policies and the will, declared his intention that the proceeds of the policies should be held in trust for the benefit of his ... children, and ... the other facts in the case disclose the same intent and support this conclusion.

*Id.* at 268. That passage, we think, applies equally to the instant case. What is more, the better-reasoned opinions in other jurisdictions appear fully consistent with the view which we espoused in *Boston Safe* and which we today reaffirm. *See, e.g., Jackman v. Equitable Life Assur. Soc.,* 145 F.2d 945, 949 (3d Cir.1944); *Tootle-Lacy National Bank v. Rollier,* 341 Mo. 1029, 111 S.W.3d 12, 16–17 (1937). *See also* 5 M. Rhodes, *supra,* § 29.52 ("The fact that the insurance trust relies upon the settlor's will is not in itself sufficient to make the trust testamentary in character.").

The determination that such a trust may be valid does not end the matter. Appellant argues that, even if the terms of a will can be read into an *inter vivos* trust to give the latter necessary substance, such a rule is inapplicable in this case for a triad of reasons. We examine them *seriatim.*

1. At the outset, Sandra urges that the result reached by the district court contravened the command of *Frost v. Frost,* 202 Mass. 100, 88 N.E. 446 (1909). In *Frost,*

---

**4.** Merle knew of the trust provisions during Manfred's lifetime, since he had sent her a copy of the Will by mail. *Cf. Kendrick,* 173 Mass. at 309, 53 N.E. 823.

the SJC ruled that the assignment of a life insurance policy to "the trustees to be named in my will" was invalid as testamentary. *Id.* at 102–03, 88 N.E. 446. But *Frost* is distinguishable in a crucial respect: no will existed at the time the designation was made, the purported assignees being trustees "to be named" in some future will. Under such circumstances, incorporation by reference was impossible; there was no ascertainable document to which the policyholder, when authoring the assignment, could have been alluding. In contrast, Manfred explicitly referred to, and described, a preexisting, unique, and easily identifiable paper. Unlike in *Frost*, the trust instructions were undeniably in the front of the insured's mind when he designated the trustee as beneficiary.

■ 2. Sandra's flagship contention is that legal revocation of the Will precluded its use in establishing the terms of the insurance trust. This sally, we suggest, overlooks the fact that revocation of a will has a necessary effect only for probate purposes; as the court below noted, the instrument may nonetheless continue to "have independent legal significance" in other contexts. D.Ct.Op at 5. *See, e.g., Thompson v. Boyd,* 217 Cal.App.2d 365, 32 Cal.Rptr. 513, 519 (1963) (revoked joint and mutual will could constitute binding contract); *Montgomery v. Blankenship,* 217 Ark. 357, 230 S.W.2d 51, 55 (1950) ("If incorporated by reference it makes no difference whether the original document of itself was valid at law or not.... A prior defectively executed will ... may thus be incorporated."); *Bianchi v. Bedell,* 2 N.J. Super. 236, 237, 63 A.2d 273, 274 (1949) (revoked will, though inutile for testamentary purposes, may be of "evidential value as a declaration of the decedent [regarding property not mentioned in later will], to be

considered together with the other evidence in the case").

So here. The Will furnished evidence of the terms of Manfred's desired life insurance trust. Whether valid or not, it contained proof of Manfred's "words and conduct and ... end to be accomplished," *Carpenter,* 362 Mass. at 777, 291 N.E.2d 609. In short, the Will is not a will as such, but simply a "means for supplying ... proof" as to the trust's particulars. *Jackman,* 145 F.2d at 949. The court may rely upon it to declare a trust, just as courts have justifiably relied on informal papers, *e.g., Barrell, supra,* intrafamilial correspondence, *e.g., Stratton, supra,* and jottings on an envelope, *e.g., Herman, supra,* to establish trusts. As the Third Circuit observed in *Jackman,* "Manifestly, the will [is] not intended to operate testamentarily in such regard." 145 F.2d at 949.

In fine, when Manfred referred to "my Last Will and Testament" in composing the policies' beneficiary designations, he identified a document that could—and did—elucidate the terms of the trust declared. Probate of the Will was in no way a condition precedent to distributing the policy proceeds.[5]

■ 3. Sandra's third effort to defeat the designations raises an interpretative question. She adverts to the last sentence of the designations, which states in relevant part: "If there is no last Will and Testament ... pay any unclaimed portion to my estate." That language, appellant urges, should be read as though an adjective—say, "valid" or "probate-eligible"—modified "Last Will and Testament." We see no sound basis for rewriting Manfred's words in this limitative fashion.

So long as contract language is plain and free from ambiguity, it must be construed

---

**5.** We discern a close analogy between the present situation and the line of Massachusetts cases in which an insured named his "wife" as the beneficiary, even though the parties' marriage was not legal. In the latter circumstance, the decisional law sensibly construes the appellation "wife" not as a precise legal definition or as a precondition for payment, but as a means of identifying the correct person to be paid. *See Prudential Ins. Co. v. Fabiano,* 39 F.Supp. 386,

387–88 (D.Mass.1941); *Strachan v. Prudential Ins. Co.,* 321 Mass. 507, 510, 73 N.E.2d 840 (1947); *Brogi v. Brogi,* 211 Mass. 512, 514, 98 N.E. 573 (1912); *cf. Clymer,* 393 Mass. at 768–72, 473 N.E.2d 1084 (extrinsic evidence admissible to establish that use of phrase "nephews and nieces" in trust indenture referred to relatives of settlor's former spouse). In the case before us, the word "Will" likewise described a particular writing without subjecting it to a legal test.

in its "ordinary and usual sense." *Boston Edison Co. v. FERC*, 856 F.2d 361, 365 (1st Cir.1988) (applying Massachusetts law). Manfred was a well-educated man; had he wished to condition incorporation of the Will on its admission to probate, he could have done so expressly. He eschewed such an option. And the challenged sentence has a plausible purpose exactly as written: it covers situations in which there might literally have been no will when Manfred died—for example, if the Will had been destroyed or could not be found.

In interpreting the designations, the district court was bound to "consider[ ] the facts and circumstances known to the decedent at the time [he] executed [his] indenture of trust." *Clymer*, 393 Mass. at 770, 473 N.E.2d 1084. Here, the uncontradicted evidence mandated an inference that the decedent intended to distribute 70% of the insurance proceeds to his children via the trust device. The court's construction of the designations, therefore, not only comports with plain language but also effectuates the settlor's discoverable intent. This, we think, was entirely fitting. *Cf. New England Structures, Inc. v. Loranger*, 354 Mass. 62, 68, 234 N.E.2d 888 (1968) (inappropriate for court to imply contract provision which parties, had it been their intention, would naturally have been expected to include). As we recently wrote in a different context: "Perhaps the law need not always align itself with common sense, but when that happy coincidence occurs, lawyers and judges should not reflexively recoil from it." *Communications Workers of America v. Western Electric Co.*, 860 F.2d 1137, 1142 (1st Cir.1988).

Having rejected each and all of appellant's arguments, we bring this segment of our rescript to a close. Notwithstanding the ineffectiveness of the Will as a testamentary vehicle, the trust alluded to in the beneficiary designations may stand. In the words of the Bard, we "let not the cloud of sorrow justle [the language] from what it purpos'd." W. Shakespeare, *Love's Labour's Lost*, Act V, scene 2 (1598).

## V. WAS EQUITABLE INEQUITABLE?

We have yet another round to make. Appellant has also assigned error to the May 30 Order, wherein the lower court granted summary judgment in Equitable's favor on the counterclaims. We scrutinize the ruling.

### A. *First Counterclaim.*

■ In her first counterclaim, Sandra charged that Equitable dealt unfairly or deceptively when it sought interpleader as to 30% of the accidental death benefit, rather than paying that share directly to her. The district court entered summary judgment for the insurer because the record contained "no indication of bad faith on the part of [Equitable]" in bringing the interpleader and paying the 30% share into court. *See* May 30 Order at 1. Equitable's perfervid protests notwithstanding,[6] we think that the district judge misapprehended the applicable law.

Like the second, the first counterclaim derived its impetus from the Massachusetts consumer protection statute, Mass.Gen.L. ch. 93A, and the Commonwealth's unfair insurance practices law, Mass.Gen.L. ch. 176D. Among other things, Chapter 93A prohibits "unfair or deceptive acts or practices in the conduct of any trade or commerce...." Mass.Gen.L. ch. 93A, § 2(a). Chapter 176D contains a similar ban against such conduct in the insurance industry. Mass.Gen.L. ch. 176D, § 2. That prohibition extends to "unfair claim settlement practices," which the statute defines as including "[f]ail[ure] to effectuate prompt, fair and equitable settlements of claims in which liability has become reasonably clear." *Id.* at § 3(9)(f). Those injured by insurance practices proscribed under Chapter 176D may sue under Chapter 93A. *See Van Dyke v. St. Paul Fire & Marine Ins. Co.*, 388 Mass. 671, 675, 448 N.E.2d

---

6. One is again reminded of the Bard of Avon:
 It is not so; for how can this be true,
 That you stand forfeit, being those that sue?

W. Shakespeare, *Love's Labour's Lost*, Act V, scene 2 (1598).

357 (1983); *see also* Mass.Gen.L. ch. 93A, § 9(1).

"Bad faith" has never been a sine qua non of Chapter 93A suits. "[N]either intent to engage in an unlawful act nor knowledge of its unlawfulness is required in order to establish liability" under the statute. *Linthicum v. Archambault*, 379 Mass. 381, 388 n. 12, 398 N.E.2d 482 (1979) (quoting Rice, *New Private Remedies for Consumers: The Amendment of Chapter 93A*, 54 Mass.L.Q. 307, 314 (1969)). In insurance cases specifically, "recovery may be had for a deceptive act that is the result of a defendant's negligence." *Swanson v. Bankers Life Co.*, 389 Mass. 345, 349, 450 N.E.2d 577 (1983). "No intention to deceive need be shown, and indeed an act might be deceptive under § 9 even absent any showing of negligence." *Id.; see also MacGillivary v. W. Dana Bartlett Ins. Agency*, 14 Mass.App.Ct. 52, 59–61, 436 N.E.2d 964 (1982). Thus, contrary to the apparent assumption of the court below, Equitable's perceived good faith was not dispositive of the issue. Nor was the fact that it did not stand to gain.

More to the point, the undisputed facts show that Equitable did not live up to its name. Sandra's entitlement to 30% of the accidental death policy was plain as a pikestaff. Less than a month after Manfred's death, Equitable paid Sandra 30% of the value of the group life policy under identical circumstances and in accordance with an identical beneficiary designation. Moreover, Sandra's right to the 30% share of the accidental death benefit had never been questioned or challenged. As the district court found, there was "no dispute as to that portion of the insurance proceeds." April 12 Order at 1. Nor was this a case where an insurer, after making a partial payment, suddenly discovered a potentially conflicting claim. To this day, Equitable has never been able to identify such a claim.

How, then, can plaintiff justify having filed an interpleader encompassing those funds? Equitable told the district court that it withheld the 30% solely to "assure[ ] the availability of a fund from which the court can award costs and attorney's fees to the stakeholder and other parties," and to "provide[ ] the Court with maximum flexibility in resolving the underlying claims." Record Appendix at 142. It sings the same narrowly-focused song on appeal. Soothing though the lyrics may sound, the libretto has no legal basis.

Interpleader is a device which was developed to protect a party against being "caught in the middle"; one rightfully in possession of property, confronted with two or more competitors who demand that property, ought not be forced to evaluate the opposing claims at its peril. The mechanism is not, however, a mere convenience for a stakeholder, exercisable at whim. Where adversative claims to a fund do not exist, a party has no right to deposit into court monies which it knows belong to another, and casually stroll away.

On this record, it is equally no defense that Equitable professes to have been safeguarding the court's interests. There are at least two major problems with this self-righteous approach. In the first place, Equitable had no standing to appoint itself as the court's watchdog. Secondly, though fees and costs may be awarded to the stakeholder in an interpleader action, the award is generally made out of the fund in controversy, *Prudential Ins. Co. v. Boyd*, 781 F.2d 1494, 1498 (11th Cir.1986), not out of whatever sums may be handy. As we have already pointed out, Sandra's right to the 30% was never a subject of dispute. If her benefits were used as Equitable suggests, she would in effect be subsidizing the insurer's expenses. Although costs and fees may be taxed directly against losing claimants when the litigants' conduct justifies doing so, *e.g.*, when claims are fraudulent or made in bad faith, 7 C. Wright, A. Miller & M. Kane, *supra*, § 1719 at 629–30, the court, not the stakeholder, should decide when behavior is so egregious as to warrant a surcharge.

These precepts point to but one conclusion. The record reflects (1) an absence of adverse claims to the 30% share, and (2) no cognizable basis for considering a surcharge against it. Equitable's duty was

clear—and it was transgressed. Lacking legal justification for withholding appellant's benefits and placing them into the court's registry, the insurer fell short of the standard set by Mass.Gen.L. ch. 176D, § 3(9)(f) in that it "[f]ail[ed] to effectuate prompt ... settlement[ ] of [a] claim[ ] in which liability ha[d] become reasonably clear." *Id.* The district court therefore erred in granting *brevis* disposition on the first counterclaim in plaintiff's favor; Sandra was entitled to a finding.

The matter, however, does not end on this note. Equitable asserts that the first counterclaim still fizzles because, even if Chapter 93A was violated, Sandra—who has now received the 30% share, together with at least some interest—"has failed to show how such an alleged violation has damaged her." Brief of Plaintiff–Appellee at 20. Appellant does not accept this characterization, adverting to three ways in which the failure promptly to pay over the 30% share harmed her. We examine these contentions.

■ 1. Sandra says that Equitable's conduct was not only improper, but was also "willful" or "knowing." If so, it was arguably violative of Mass.Gen.L. ch. 93A, § 9(3), thereby creating a possible entitlement to enhanced damages. *See id.* (providing for recovery of "up to three but not less than two times [the] amount [of actual damages]" if the respondent has committed a "willful or knowing violation" of Chapter 93A, § 2). In this case, the evidence would not sustain such a finding.

The "willful or knowing" precondition is "directed against callous and intentional violations of the law...." *Heller v. Silverbranch Const. Corp.*, 376 Mass. 621, 627, 382 N.E.2d 1065 (1978); *see also* Rice, *op. cit. supra*, 54 Mass.L.Q. at 318. The standard is an objective one. *Heller*, 376 Mass. at 628, 382 N.E.2d 1065. Viewed dispassionately, the insurer's behavior, albeit negligent (and wrong), cannot be characterized as callous. First, this is not a case where an insurer held back (and en-

joyed the use of) funds belonging to an insured. Equitable gained nothing for itself, because it paid the 30% share into court. Second, as the district judge correctly found, May 30 Order at 1, there was "no indication of bad faith on [Equitable's] part...." [7]

We need not belabor the obvious. Though an infraction occurred, there is not sufficient evidence that it was "willful or knowing." *Compare, e.g., Shapiro v. American Home Assurance Co.*, 616 F.Supp. 906, 920 (D.Mass.1985) (though insurer's disclaimer of coverage was unfounded, insureds did not meet their burden of presenting evidence to show willful or knowing violation, or bad faith).

■ 2. Sandra next argues that, even absent a finding of "willful or knowing" misconduct, she is entitled to some further relief on her first counterclaim. Yet she is limited by the operative statute to her "actual damages or twenty-five dollars, whichever is greater." Mass.Gen.L. ch. 93A, § 9(3). Like the purchaser or the policyholder, the beneficiary of an insurance policy "acquires a contractual right to payment" of the policy amount, under stipulated terms and conditions. *DiMarzo v. American Mut. Ins. Co.*, 389 Mass. 85, 95, 449 N.E.2d 1189 (1983); *Dodd v. Commercial Union Ins. Co.*, 373 Mass. 72, 81, 365 N.E.2d 802 (1977); *cf. Abrams v. Reynolds Metals Co.*, 340 Mass. 704, 708, 166 N.E.2d 204 (1960) (damages for breach of contract assessed on the principle "that the injured party shall be placed in the same position he would have been in if the contract had been performed"). Thus, the ceiling on Sandra's claim was 30% of the face amount of the policy, or $20,700.

■ Appellant received this sum on or about April 12, 1985, in pursuance of the April 12 Order—but that payment did not necessarily wipe the slate clean. Sandra was also entitled to interest at the rate of 12% on the wrongfully-withheld funds for the period of detention. *See* Mass.Gen.L.

---

7. That being so, the alternate basis for enhancement of damages under § 9(3), which uses bad faith as a springboard, does not avail appellant.

ch. 231, § 6C (prejudgment interest available in claims for breach of contract from date of breach or demand). While she received some interest when the principal sum was belatedly paid, the record is tenebrous as to whether she received what was rightfully due to her.[8]

Rectifying this omission requires a mere arithmetical computation, not a new trial. Equitable paid over the 30% share of the group life proceeds on August 15, 1980. It should have tendered the 30% share of the accidental death benefit at about the same time. This, then, can fairly be treated as the date of breach for purposes of section 6C. Sandra did not receive the principal until some 56 months later (approximately April 12, 1985). Thus, the district court, on remand, should calculate the interest due for the period August 15, 1980 through April 12, 1985 at 12% per annum, *see id.;* determine how much (if any) interest Sandra actually received when the $20,700 principal share was paid over; credit the latter against the former; and order Equitable to pay any remaining balance.

 3. Appellant also claims an entitlement to counsel fees. We agree with her that attorneys' fees can be awarded to a prevailing plaintiff in a case like this notwithstanding the insurer's lack of willfulness. *See* Mass.Gen.L. ch. 93A, § 9(4). Yet in this case, any such fees would be *de minimis.* In the main, Sandra's guns were trained on the two 70% shares. The record does not indicate that any meaningful amount of legal work was independently required because of the presence of the 30% accidental death benefit share in the case.[9] Fairness is a two-way street: to sanction an award of attorneys' fees to Sandra in this instance would not do justice, but rather would produce an undeserved windfall for appellant. We will not permit the tail to wag the dog in so witless a fashion. The prayer for counsel fees must be denied.

### B. *Second Counterclaim.*

 Appellant's second counterclaim alleged that Equitable violated Chapters 93A and 176D by refusing to pay the estate the 70% shares due under the policies, instead commencing the interpleader action. The averment is baseless. There were conflicting claims to these proceeds, of sufficient substantiality as to make resort to interpleader not merely appropriate, but advisable. Moreover, in light of our conclusion that the 70% shares rightfully belong to Merle as trustee, *see supra* Part IV, the premise upon which the second counterclaim rests is obviously unsupportable. Summary judgment was fully warranted.

## VI. REQUIESCAT IN PACE

We need go no further. The judgments below are affirmed, save only for the summary judgment in plaintiff's favor on the first counterclaim. That judgment will be reversed and the matter remanded to the district court for the calculation of additional interest due (if any), in accordance with Part V(A) of this opinion.

*Affirmed in part; reversed in part; remanded.* Costs allowed in favor of defendant-appellee Merle Joy Englehart to be taxed against appellant. As between appellant and plaintiff-appellee, each shall bear her/its own costs.

### APPENDIX

### RELEVANT EXCERPTS FROM LAST WILL AND TESTAMENT OF MANFRED OWEN ENGLEHART, JR.

ARTICLE II: I give, devise and bequeath all the property of which I die pos-

---

**8.** If the funds earned a rate of interest less than 12% while in the district court's registry, that is Equitable's problem; the $20,700 with which the first counterclaim is concerned should never have been deposited in the first place.

**9.** We note in passing that, once the money was deposited, Sandra moved lethargically in attempting to retrieve the 30% share. She waited for an inexplicably long time before finally deigning to ask the court for a disposition as to this sum. We continue to believe that "[t]he law ministers to the vigilant, not to those who sleep upon perceptible rights." *Puleio v. Vose,* 830 F.2d 1197, 1203 (1st Cir.1987), *cert. denied,* ——— U.S. ———, 108 S.Ct. 1297, 99 L.Ed.2d 506 (1988).

sessed, both real and personal, to my former wife, Merle Joy Englehart, IN TRUST, however, for the support, care and education of the children born of our marriage and known to me at the making of this Will as John Owen, Colleen Ann, William Lawrence and Andrew David.

ARTICLE III: I hereby declare the above named Trustee shall have absolute control of my entire estate and shall have the power to use, or dispose of any or all of my estate for the use of my children as said Trustee may deem necessary for the duration of the Trust. There shall be no restrictions or limitations on said Trustee, whose discretion and decisions shall not be questioned by any party, including the beneficiaries of this Trust, in anything said Trustee shall do as long as the decision is based on the needs of my children named above as the beneficiaries of this Trust.

ARTICLE IV: Said Trust shall endure and continue until the last of my four children shall have reached the age of eighteen (18) full years, at which point in time the Trust shall cease, and I instruct said Trustee to liquidate the Trust and distribute the Trust residue to the issue of my former marriage, as named herein, equally per stirpes.