Sweeney, J.
The plaintiff Linda Hopkins brings this action against Liberty Mutual Insurance Company (Liberty), alleging unfair settlement practices in violation of G.L.c. 176D, §3(9)(f), and seeking damages under G.L.c. 93A, §9(3).[1] For the reasons set forth herein, judgment is to enter for the plaintiff as follows:
1. Actual damages in the amount Eighty-Three Thousand Seven Hundred Thirty-Three ($83,733.00) Dollars. Four Hundred Thousand ($400,000) Dollars,* with statutory interest of 12% thereon from the date of the filing of this action.
2. Punitive damages in the amount of One Hundred Sixty-Seven Thousand Four Hundred Sixty-Six ($167,466) Dollars, with statutory interest of 12% thereon from the date of the entry of this judgment.
3. Reasonable attorneys fees incurred in prosecuting this claim against Liberty.
4. The plaintiffs costs of this action.
Based on the credible evidence presented at this jury waived trial, I find the following facts. On February 7, 1992, the plaintiff was seriously injured in a motor vehicle accident. The multi-car collisions occurred on East Street in Pittsfield, Massachusetts. Ms. Hopkins was operating her car behind a vehicle driven by Arthur A. Peterson. Behind Ms. Hopkins was a car driven by Robert M. Whipple. The Whipple vehicle struck the rear of the Hopkins vehicle, pushing her car into the rear of the Peterson vehicle (first impact). After striking the Hopkins’ car, the Whipple vehicle was struck from behind by a truck owned by the Tire Centers, Inc. (TCI) and operated by its employee, Robert Jones. This caused a second impact between the Whipple vehicle and the Hopkins vehicle. The TCI vehicle was in turn struck by a vehicle operated by Cohlin Drake. This caused yet another impact (third impact) between the Whipple and Hopkins vehicle. Since the accident occurred on a straight road and on a sunny and dry day, it was readily apparent to the police officer who investigated the accident and to the various insurers’ representatives that the accident *102 was caused by the Whipple car following the Hopkins car too closely, and by the TCI truck following the Whipple vehicle too closely and by the Drake car following the TCI truck too closely.
Liberty insured TCI under a commercial automobile liability policy, in the amount of One Million ($1,000,000) Dollars. Under the terms of the policy, Liberty was required to obtain authorization from TCI for all settlements in excess of $20,000.[2] Under a separate excess liability policy, Liberty provided an additional Five Million ($5,000,000) Dollars for TCI. Mr. Jones was insured under a separate policy with Liberty.
Mr. Whipple was insured by Quincy Mutual Insurance Company (Quincy) in the amount of Fifty Thousand ($50,000) Dollars.
Mr. Drake was insured by Liberty for Twenty Thousand ($20,000) Dollars.
On March 13, 1992, Ms. Hopkins’ lawyers, Ralph and David Cianflone, notified TCI that they were representing Ms. Hopkins in her claim against TCI for injuries she sustained in the accident. TCI forwarded this letter to Liberty. On April 1, 1992, Liberty’s representative notified the Cianflones that it insured TCI and all information regarding the Hopkins’ claim should be forwarded to Liberty. From that time until approximately September 1994, Ms. Hopkins’ lawyers corresponded regularly with Liberty, updating its adjusters on Ms. Hopkins’ condition and her continuing medical treatment.
At the time of the accident, Ms. Hopkins was a licensed master plumber, earning approximately Thiriy-Two thousand ($32,000) Dollars per year. A few years before the accident she was treated for spondylolisthesis which had caused her to experience a modest loss of function in her right leg and some numbness and discomfort in that limb. This condition did not interfere with her ability to work in her trade. When her car was struck by the other vehicles on February 7, 1992, the plaintiff felt pain in her neck and lower back. By April 1992, her physician noted that the plaintiff complained that left sided neck pain was radiating into her shoulder. The physician continued his orders of conservative medical treatment, including physical therapy and a back brace.
From the time of the accident until January 1994, the plaintiffs symptoms included pain and numbness in her neck and inner scapular, as well as pain in her left buttock and low back. Although she cooperated with treatment procedures and was followed closely by her physicians, she was unable to regain enough function, both in terms of pain management and limb movement, to resume her trade, as a plumber. Efforts to retrain her in the computer field were of no avail, since the hand and arm movement necessary to operate computers aggravated the neck problem.
After more testing, the plaintiffs physicians diagnosed her as suffering from a herniated cervical disc at C6-7 with a corresponding radiculopathy causing a loss of function in her upper right arm. In addition, Dr. Howard Kanner, who treated Ms. Hopkins, determined that the spinal injury she suffered in the accident aggravated her pre-existing spondylolisthesis. On January 27, 1994, neurological surgeons at the University of Massachusetts Medical Center performed a cervical discectomy at C6-7 and a cervical fusion using a harvested bone graft. As she had in the past, the plaintiff continued to cooperate with treatment directives, including physical therapy, exercise and weight loss.
Despite the surgical intervention and Ms. Hopkins’s efforts at physical rehabilitation and job retraining, she remains unable to work and will never be able to work as a plumber. Her main treating physician, Dr. Bouillon, has opined that as a result of the accident, Ms. Hopkins had suffered a 25% permanent loss of function of her cervical spine and a 5% loss of function of her upper right extremity. Additionally the accident’s aggravation of her spondylolisthesis resulted in a 10% loss of function of her lumbar spine.
After updating Liberty with Ms. Hopkins’ medical bills and medical reports, the plaintiffs lawyers sent a settlement demand letter to Liberty on October 14, 1994. The demand was Seven Hundred Thousand ($700,000) Dollars, based on medical bills of approximately Fifty-one Thousand ($51,000) Dollars, the loss of bodily function, outlined above, surgical scarring, loss of income to that date of Ninety Thousand ($90,000) Dollars and future loss of earning capacity, estimated at Seven Hundred Seventy-Five Thousand ($775,000) Dollars. When an offer was not forthcoming, Ms. Hopkins’ lawyers sent a 93A demand letter to Liberty on December 29, 1994.[3] No offer was received and the plaintiff filed this lawsuit on February 2, 1995. Her complaint alleged negligence against TCI, Jones, Whipple and Drake and sought damages from them for the injuries she sustained in the accident. In Count VI of the complaint she alleges that Liberty violated both Chapter 176D and Chapter 93A of the General Laws and seeks damages under the latter statute.
Whipple and Drake settled for the full amounts of their policies: $50,000 paid by Quincy of a behalf of Whipple and $20,000 paid by Liberty on behalf of Drake. Liberty’s first settlement offer, on behalf of TCI and Jones, was made on April 24, 1996 when it offered a combined settlement of Four Hundred Thousand Dollars. The offer was contingent upon the parties arriving at a structured settlement based on the Four Hundred Thousand Dollars and executing releases to all defendants.
The plaintiff did not accept this offer. On August 21, 1996, TCI and Jones made the plaintiff an Offer of Judgment, pursuant to Mass.R.Civ.P. 68, in the amount of Four Hundred Thousand ($400,000) Dol *103 lars. On October 15, 1996, Liberty, on behalf of TCI and Mr. Jones, and Ms. Hopkins reached a structured settlement with a value of Four Hundred Thousand ($400,000) Dollars.[4] The settlement provided that Hopkins would enter into an agreement for judgment with Jones and TCI and execute a full release of their liability to her. It was further agreed that the plaintiff s G.L.c. 176D claim and her G.L.c. 93A claim against Liberty would survive the settlement. Those claims are now before the court for resolution.
The defendant Liberty engaged in unfair settlement practices by failing to tender an offer of settlement to the plaintiff within a reasonable time after receiving the plaintiffs settlement demand of Seven Hundred Thousand ($700,000) Dollars. This demand was made on October 14, 1994. Liberty, on behalf of TCI and Mr. Jones, did not make any offer to the plaintiff until April 24, 1996.
More than two years one-half years passed between the February 1992 accident and the plaintiffs October 1994 demand letter. Throughout this time, Liberty was kept fully updated on the plaintiffs ongoing medical treatment, including diagnostic procedures. Liberty’s adjusters were fully aware that Ms. Hopkins’s medical condition was not improving. They received all of her medical reports from the plaintiffs counsel on a timely basis. In addition, in June 1992 Ms. Hopkins voluntarily submitted to an independent medical examination at Liberty’s request.
During this same time period, Liberty had ample opportunity to investigate the circumstances of the car accident and assess its insureds’ liability. Although this was a five-car chain reaction accident, it was not so complicated an event that it would take an insurer more than two years to reasonably determine how it happened. Indeed, Liberty’s own records during the February 1992 to October 1994 time period reveal that Liberty’s representatives recognized their insureds’ legal responsibility in causing the accident. By June 22, 1991, Liberty had a full copy of the Pittsfield Police Department’s Accident Report, authored by Officer Bruce Hugabone. This detailed report, which includes statements of the individuals involved in the accident, states that the strongest impact was the second one, caused by TCI’s heavy truck striking the rear of the Whipple vehicle, causing it to impact for a second time with the Hopkins vehicle. Liberty was aware that a citation was issued to its insured, Mr. Jones. Nonetheless, a Liberty employee, “Bartholomew,” entered a file note that the case was complex and liability needed to be sorted out. He opined that it was “possible we owe nothing to the occupants of the Hopkins vehicle.”
By August 7, 1992, the “possibility” of no liability to Ms. Hopkins appears to have diminished. On that date, the Liberty adjuster handling the claim wrote an internal memorandum stating that he and the adjuster for Quincy had agreed that “we will pay the case three ways” — meaning that Quincy on behalf of Whipple, Liberty on behalf of TCI and Jones and Liberty on behalf of Drake would share equally in settling the case. In that same memorandum, Liberty acknowledged it would handle the resolution of the claims on behalf of the two insurance companies and their respective insureds. The liability of TCI and Jones was further confirmed by an October 2, 1992 telephone conversation between Liberty’s adjuster and Mr. Whipple. In that call, Mr. Whipple told the adjuster that Jones was following too closely to Whipple’s car and pushed that car into the Hopkins’ vehicle.
With its investigation substantially completed, Liberty and Quincy confirmed that they would proportionately share liability for Ms. Hopkins’ injuries. That understanding was memorialized in a December 2, 1992 letter from Quincy to Liberty. An internal memorandum of April 30, 1993, restates Liberty’s understanding of its insureds’ shared responsibility with the Quincy insured. With Ms. Hopkins’s medical situation still unresolved but based on the medical reports and bills it had as of November 24, 1993, Liberty noted in an internal memorandum that the Hopkins claim had a value of between $67,500 and $80,000. In that same memorandum, the agreement with Quincy was repeated. On December 2, 1993, Liberty’s adjuster received authority to contribute $27,000 to a settlement of the Hopkins claim. Six weeks later, on January 25, 1994, Liberty wrote to TCI seeking its insured’s authority to contribute this amount to a settlement offer. A month later, on February 24, 1994, Quincy notified Liberty that Ms. Hopkins’s counsel had recently told its representative that Ms. Hopkins had just undergone back surgery and thus, “. . . the case is not near settlement.” A similar entry in its file was made by Liberty’s adjuster on March 11, 1994.
After receiving Ms. Hopkins’ UMass Medical Center’s surgical bills and reports, her attorney forwarded them to Liberty on July 21, 1994. A supplemental medical report was sent on August 30, 1994. Following receipt of the October 14, 1994 demand letter, Liberty entered an internal memorandum in is file stating:
The question is what we did and what was pre-ex-isting and ultimately what necessitated the surgery. The meds claimed are 50K. The average annual income is $31,000. Future lost earning capacity alleged to be $775,000. Demand 700K. The reserve is too low. I will check special handling and reserve.
The adjuster wrote in the file that same day that she had raised the reserve to “75K.” That same day, the file was transferred to a new adjuster, Edward Ostrander. He made a notation in the file that TCI had to be informed of this large reserve increase.
On October 27, 1994, Mr. Ostrander noted in the file that Liberty had now offered its full $20,000 policy on behalf of its insured, Cohlin Drake. He also noted that Ms. Hopkins’s attorney expected that Quincy would be shortly offering its full policy of $50,000 on *104 behalf of its insured, Robert Whipple. Based on this information, Mr. Ostrander recommended that the reserve be increased to Two Hundred Fifty Thousand ($250,000) Dollars. Additionally, he directed an outside adjuster to conduct an “activities check” on Ms. Hopkins. At the same time, he asked the plaintiffs counsel to provide him with Ms. Hopkins’ income tax records. By November 16, 1994, Liberty received Ms. Hopkins’ tax records for 1988-1991. Liberty still did not make a settlement offer to the plaintiff.
On January 28, 1995, Liberty responded to the plaintiffs December 29, 1994, Chapter 93A demand letter. In that response, Liberty’s counsel informed the plaintiffs counsel that the liability of Liberty’s insureds was not clear because of the chain reaction nature of the collision. Additionally, Liberty’s counsel said that the insurer needed more medical and employment records before it could properly evaluate the claim. Five days later, on February 2, 1995, Ms. Hopkins filed suit. Her claim against Liberty’s insureds was answered by Attorney Philip Callan on March 28, 1995. Attorney Callan pursued an aggressive and thorough inquiry into TCI’s and Jones’ potential defenses. He took depositions of the various parties, reviewed police reports, and through discovery obtained Ms. Hopkins’ medical and employment records. Additionally, he had a Liberty adjuster undertake surveillance of Ms. Hopkins. Liberty suggests that the thorough and professional efforts of Mr. Callan in defending TCI and Jones should inure to Liberty’s benefit with respect to Ms. Hopkins’s 93A claim against it. Liberty does not stand in the shoes of a third-party beneficiary of Mr. Callan’s efforts. The fact that Mr. Callan had to bring himself up to snuff, through discovery, as to both liability and damages, in order to properly defend his clients, does not excuse Liberty from its own employees’ knowledge that the liability of TCI and Mr. Jones was clear and that Ms. Hopkins’s damages were reasonably established before suit was brought.
General Laws, Chapter 176D, section 3(9)(f) provides that it is an unfair settlement practice for an insurer to fail “to effectuate prompt, fair and equitable settlements of claims in which liability has become reasonably clear.” Liability is reasonably clear if fault and damages are not subject to good faith disagreement. Clegg v. Butler, 424 Mass. 413, 418 (1997). As discussed above, by December 1994, TCI’s and Jones’ Lability was clear and Ms. Hopkins’s damages were reasonably established. As of November 1993, Liberty had repeatedly stated through internal memorandum and correspondence and communications with Quincy that the two insurance companies’ insureds were jointly liable for Ms. Hopkins’ injuries. Indeed, Liberty’s representatives were so comfortable on this score that they had agreed with Quincy not only to contribute a proportionate share to a settlement but to handle Quincy’s interests as well in reaching a resolution of the plaintiffs claim.
Liberty’s concerns about liability only surfaced when its adjuster learned that Ms. Hopkins’s injuries were more serious than originally thought. When Liberty received the plaintiffs demand letter in October 1994, more than two years had passed since the accident. Liberty had acknowledged liability for that accident in 1992. Liberty’s October 14, 1994 internal memorandum which stated “the question is what we did and what was pre-existing” is nothing more but a self serving document to protect Liberty from the increased monetary exposure it now faces, rather than a reference to a legitimate concern about liability.
Liberty had received essential medical reports and bills from plaintiffs counsel by August 1994. Counsel promptly supplemented that documentation. By the time the settlement demand was received, Liberty was essentially fully informed about the nature of the plaintiffs injuries, the loss of function she had sustained and the likely impact of those injuries on her ability to work in the future. If Liberty’s adjusters felt it was appropriate to put Ms. Hopkins under surveillance, they had over two and a half years to do so before receipt of the settlement demand. Yet it took them yet an additional year from the settlement demand to conduct such surveillance. And what did the surveillance reveal? It confirmed exactly what the plaintiff claimed i.e. she was physically impaired. Likewise, all of the discovery undertaken by Liberty’s counsel did nothing more but confirm what Liberty had already confirmed years earlier; the fault of the insureds was clear and the damages were significant.
The requirement of an insurance company to fairly settle reasonably clear liability claims against its insured does not run just to the insured but extends to third-party claimants such as Ms. Hopkins. Van Dyke v. St Paul Fire & Marine Ins. Co., 388 Mass. 671, 675 (1983). Such claimants have a right to bring an action against an insured for unfair settlement practices, pursuant to G.L.c. 93A, §9(1). That provision states that “any person whose rights are affected by another person violating the provisions of [G.L.c. 176D, §3(9)] may bring an action in the Superior Court.” See also, Polaroid Corp. v. Travelers Indem. Co., 414 Mass. 747, 754 (1993) and Transamerica Ins. Group v. Turner Construction Co., 33 Mass.App.Ct. 446, 452 (1992), cited as authority in Clegg v. Butler, Id.
Liberty makes the disingenuous argument that even if it engaged in unfair settlement practices in its dealings with the plaintiff, it must still prevail since there is no evidence that the plaintiff would have accepted the $400,000 settlement any earlier than September or October. It bases this assertion on the fact that when it finally did make an offer of $400,000 in April 1996, it was not accepted by the plaintiffs until September 1996. Kindly stated, Liberty has overlooked a few important details. Its April 1996 offer was contingent on the plaintiff agreeing to an unspecified structured settlement requirement. Moreover, it was *105 contingent on full releases, including releases to Liberty. The offer, in its original form, was never accepted by the plaintiff. Agreement between Ms. Hopkins and the defendants Jones and TCI was reached only after structured provisions were worked out and the settlement with Jones and TCI severed from plaintiffs Chapter 93A claim against Liberty. Before this settlement, the plaintiff increased her demand to more than a million dollars. The fact that at the pretrial conference the plaintiff agreed to the judge’s suggestion to mediate the case does not diminish the defendant’s bad faith conduct. All it does is underscore the plaintiffs continuing willingness to fairly resolve her underlying claim against Liberty’s insureds.
Despite Liberty’s claim to the contrary, the plaintiffs Chapter 93A demand letter of December 1994 did adequately advise Liberty of the damages the plaintiff was claiming against it. That 93A demand letter attached and incorporated the October 1994 letter demanding a $700,000 settlement. The 93A demand specifically stated that Liberty was liable for double or treble that amount. While it is the court’s view that the settlement amount is not the actual damage referred to in G.L. 93A, §9(3), the damages the plaintiff did suffer are certainly included within the plaintiff s overly broad damage claim. Chapter 93A, section 9(3) provides:
if the court finds for the petitioner, recovery shall be in the amount of actual damages or twenty-five dollars, whichever is greater; or up to three but not less than two times such amount if the court finds that the use or employment of the act or practice was a willful or knowing violation ... or that the refusal to grant relief upon demand was made in bad faith . . . For the purposes of this chapter, the amount of actual damages to be multiplied by the court shall be the amount of the judgment on all claims arising out of the same and underlying transaction or occurrence . . .
In Clegg v. Butler, supra at p. 424, the Supreme Judicial Court observed that the “actual damage” definition in G.L.c. 93A, §9(3), was enacted in response to the Court’s holding in Bertassi v. Allstate Ins. Co., 402 Mass. 366 (1988), wherein the Court limited damages subject to multiplication to the loss of use of the damages from the underlying claim. Id. The damage amendment “greatly increased the potential liability of an insurer who willfully, knowingly or in bad faith engages in unfair business practices.” Clegg v. Butler, supra at page 424. Not withstanding this statutory change, the Court in Clegg applied the Bertassi damage measure since the underlying claim was reached through settlement rather than by judgment. Id. at 425. Two months after the Clegg decision, the Appeals Court, in Yeagle v. Aetna Casualty & Surety Company, 42 Mass.App.Ct. 650, 654, rev. den., 425 Mass. 1105 (1997), declined to adopt an underlying judgment as the measure of damages for multiplication purposes where a an insurer had not engaged in good faith settlement practices.
In this case, it is unnecessary to stray beyond the damage measure employed in Clegg. Although the plaintiffs underlying claim against TCI and Mr. Jones resulted in a judgment, it was a judgment entered pursuant to the plaintiffs acceptance of the TCI’s and Jones’ Rule 68 offer of judgment. There was not a trial, or even a hearing by the court to approve the judgment. A judgment, within the context of G.L.c. 93A, §9(3), as amended by St. 1989, c. 580, § 1, presupposes a decision by a court. Bonofiglio v. Commercial Union Ins. Co., 411 Mass. 31, 37 (1991). The resolution of the dispute between Hopkins and TCI and Jones was a settlement, no matter the nomenclature. To hold otherwise would inappropriately punish insurers beyond that which the legislature intended; “the statute does not punish settling insurers by placing the entire settlement award at risk of multiplication. Clegg v. Butler, supra at 425.
Thus, the plaintiffs actual damages are the costs and expenses she has incurred as a result of Liberty’s unfair and deceptive settlement practices. Bertassi v. Allstate Ins. Co., supra at 372-73. Her damage is the interest wrongfully withheld from her. Equitable Life Assurance Soc. v. Engleart, 867 F.2d 79, 90 (1st Cir., 1989). She has lost interest on the settlement amount from January 26, 1995 to October 15, 1996. January 26, 1995 was the 30th day by which Liberty could have responded to the plaintiffs 93A demand letter, with a reasonable offer of settlement. (G.L.c. 93A, §9(3).) October 15, 1996 was the day agreement of entry of judgment was filed on the plaintiffs underlying claims against TCI and Mr. Jones. Since the defendant has breached its duty to the plaintiff of fair dealing and since the plaintiff and defendant do not stand in privity with one another, the plaintiffs claim against Liberty sounds more in tort than in contract. See, Industrial Gen. Corp. v. Sequoia Pac. Sys. (1994, DC Mass.) 849 F.Sup. 820, 827 n. 14, revd on other grounds, remanded 44 F.3d 40. Accordingly, it is appropriate to apply the 12% interest rate for tort claims, as provided in G.L. 231, 6B. Since the funded settlement was Four Hundred Thousand ($400,000) Dollars, the plaintiff is entitled to 12% interest per annum on that amount. Therefore, her actual damages to date are Eighty-Three Thousand Seven Hundred Thirty-Three ($83,733.00) Dollars. The plaintiff is also entitled to be compensated for reasonable attorneys fees incurred in pursuing this action against Liberty.
Because I find that the defendant Liberty acted in bad faith in failing to reasonably settle this claim, I am trebling the amount of the plaintiffs actual damages. As detailed above, Liberty deliberately refused to make any offer in this case until April 1996, despite knowing in 1992 that its insureds were at fault and knowing in late 1994 the extent of the plaintiffs damages. Over this period of time Liberty incrementally increased its *106 reserves from Twenty Thousand ($20,000) Dollars to Two Hundred Fifty Thousand ($250,000) Dollars. Yet it never made an offer until 1996, despite knowing that the other defendants had settled for the maximum of their respective policies. There were medical liens on the plaintiffs case. She was and is unable to work because of her injuries. Liberty knew this and wrongfully deprived her of the money its insureds owed her for these immediate and very tangible losses. Schwartz v. Rose, 418 Mass. 41 (1994).
It is therefore ordered that judgment shall enter for the plaintiff and damages awarded to her as follows:
1. Actual damages in the amount Eighty-Three Thousand Seven Hundred Thirty-Three ($83,733.00) Dollars. Four Hundred Thousand ($400,000) Dollars, with statutory interest of 12% thereon from the date of the filing of this action.
2. Punitive damages in the amount of One Hundred Sixty-Seven Thousand Four Hundred Sixty-Six ($167,466) Dollars, with statutory interest of 12% thereon from the date of the entry of this judgment.
3. Reasonable attorneys fees incurred in prosecuting this claim against Liberty.
4. The plaintiffs costs of this action.
Within thirty days of the entry of this order of judgment, plaintiffs counsel is to provide the court with an affidavit setting forth the attorneys fees and costs incurred in pursuing this action. The defendant may within ten days of service of those submissions file an objection to those amounts. The court will thereafter conduct a hearing to finalize the amount of the plaintiffs attorneys fees. Thereafter, final judgment will enter.

The other plaintiff, Myra Hopkins, was a passenger in Linda Hopkins’s vehicle. All of her claims were settled by the time of trial.

There was no evidence at trial that TCI ever prevented Liberty from settling the Hopkins claim.

G.L.c. 93A, §9(3).

The structure settlement provided an immediate lump sum payment of $262,445 and a guaranteed monthly payment of$l,000for 240 months, beginning November 15, 1996 and ending October 15, 2016.