Connon, Richard F., J.
This case involves estate planning gone awry in the claims of ownership to two parcels of real estate located in Yarmouth, Massachusetts.

BACKGROUND

James A. Rogers, Sr. (“James, Sr.”), now 89 years old and widowed, is the father of James A. Rogers, Jr. (“James, Jr.”) and Richard E. Rogers (“Richard”). James, Sr. is a retired police officer from Newton, Massachusetts. He had been married to Mary Elizabeth Rogers (“Betty”), who died on September 26, 2001. James, Jr. is retired and married to Susan E. Farrell (“Susan”), and they now live in West Yarmouth, Massachusetts. Richard is divorced and lives at the property on 154 Old Main Street (“the Old Main Property”) in South Yarmouth with his father James, Sr.
On January 16, 1979, James, Sr. and Betty purchased the property on 33 Almira Road in South Yarmouth (“the Almira Property”). On October 22, 1980, James, Sr. and Betty purchased the Old Main Property from James, Jr. and his first wife, Ruth. As of September 2000, there was a small mortgage on the Almira Property, and no mortgage on the Old Main Property. Because of his parents’ advanced ages, and the prospects of a Medicaid issue, James, Jr. approached them with his concerns about the future possibility of Medicaid liens being placed on the Almira Property and the Old Main Property (collectively “the Properties”). According to James, Jr., his mother Betty asked him to get some more information on those issues.
Eventually James, Jr. located attorney William Brewin (“Attorney Brewin”), who had a practice in Marlboro, Massachusetts specializing in real estate, wills, trusts, zoning and Medicaid planning. Attorney Brewin had received his law degree from Boston College and had a Masters in Taxation from Boston University. Sometime in October 2000, James, Jr. called Attorney Brewin to request an appointment. James, Jr. met with Attorney Brewin on October 11, 2000, and provided Attorney Brewin with the information regarding his parents, who at the time were both 83 years of age. In addition to the value of their real estate, other assets that they held, plus their income, it was James, Jr. who suggested to Attorney Brewin that he and his wife Susan should end up with the Almira Property and that his brother Richard should end up with the Old Main Property. James, Jr. asked about the various options for estate planning in consideration of the looming Medicaid issues. After some discussion, Attorney Brewin advised of various options from an irrevocable trust with a power of appointment to transferring the property outright. In particular, the discussions involved the look-back rules and the disqualification periods for Medicaid. Medicaid requires a 36-month look-back period for an outright transfer, and a five-year look-back period for a transfer to an irrevocable trust.
After the meeting, Attorney Brewin devised a plan and prepared all the necessaiy documents, which James, Sr. and Betty would sign when they came to his office on November 20, 2000. Upon their arrival, James, Sr. and Betty were handed the following documents: (1) a quitclaim deed conveying the Old Main Property to James, Jr. as trustee of the Rogers Family Irrevocable Trust (“the Rogers Trust”) U/D/T November 20,2000; (2) a quitclaim deed conveying the Almira Property to James, Jr., “Trustee of The 33 Almira Road Realty Trust” U/D/T November 20, 2000; (2) a twelve-page trust agreement for the Rogers Trust; (4) a three and a half page durable power of attorney to be signed by Betty; (5) a three and a half page durable power of attorney to be signed by James, Sr., appointing his son James, Jr. as his attorney in fact; (6) a “Disqualification Notice,” advising the Rogers that they are ineligible for qualifying for Medicaid for at least 36 months; and (7) a declaration of trust establishing the 33 Almira Road Realty Trust (“the Almira Trust”). During this meeting, Attorney Brewin went over the documents in detail before James, Sr. and Betty signed them. Attorney Brewin’s observations of James, Sr. and Betty at the signing of these documents were that Betty was veiy sharp and James, Sr. was mostly quiet but listening. The entire meeting lasted about an hour. No copies of any of the documents had been previously given to James, Sr. and Betty before this office visit.
*362 James, Sr. was given copies after signing the documents, and put those copies in a desk drawer. Some time in December 2003 or January 2004, James, Sr. went to see attorney Richard Perry (“Attorney Perry”) because he wanted the Properties put back into his name. Attorney Perry had his law office in Brewster, Massachusetts, specialized in conveyancing, and was a Land Court Examiner. When James, Sr. went to Attorney Perry’s office, his son Richard drove him there. James, Sr. had given all the documents that he had signed on November20,2000, to Attorney Perry. When James, Sr. first met with Attorney Perry on December 15, 2003, he was angry, demanding, and knew that he wanted to undo all that had been done on November 20, 2000, and put the Properties back in his name. After reviewing the documents, Attorney Perry discussed the problems of trying to undo what had been done, in particular the burden of proof required to rescind the deeds. What Attorney Perry decided to do was to “throw a legal monkey wrench into the title of the two properties.” Attorney Perry then prepared, and had James, Sr. execute, the following documents: (1) a “Revocation and Termination of the Durable Powers of Attorney” that James, Sr. gave to James, Jr.; (2) a“Removal of Trustee, Appointment of Successor Trustee and Acceptance of Appointment,” which in effect removed James, Jr. as trustee for the Almira Trust and put James, Sr. in his place; (3) a “Removal of Trustees Appointment of Additional Successor Trustee and Acceptance of Appointment,” which in effect removed James, Jr. as trustee for the Rogers Trust and put James, Sr. in his place; (4) a quitclaim deed for the Old Main Property from James, Sr., as additional successor trustee of the Rogers Trust, to James, Sr. in his individual capacity; and (5) a quitclaim deedfor the Almira Property from James, Sr., “Successor Trustee of The 33 Almira Road Realty Trust,” to James, Sr. in his individual capacity. On January 8, 2004, Attorney Perry sent a letter to James, Jr. to notify him of the changes his father had made, along with the copy of those documents.
In addition to the aforementioned documents, Attorney Perry prepared and James, Sr. executed a new will dated January 26, 2004. This will provided for both his sons James, Jr. and Richard, however not to the same extent as the estate plan created on November 20, 2000. Under this new will, Richard would receive the Old Main Property, and the Almira Properly would be divided equally between Richard and James, Jr. Richard was to be named executor and James, Jr. was the alternate executor. James, Sr.’s previous will, executed in 1997, provided that the bulk of his estate would go to Betty, and in the event that Betty predeceased him, the estate would be divided equally, with Richard receiving the Old Main Property and James, Jr. receiving the Almira Property. Both sons were named as co-executors.
At trial, there was testimony from Brooks S. Thayer (“Attorney Thayer”), an attorney who specializes in estate planning and Medicaid laws. Attorney Thayer opined that the method of estate planning chosen by Attorney Brewin was “very curious and had some very serious problems with it.” Attorney Thayer explained that one must be willing to give up some level of control to protect assets from either being reached by Medicaid, or spent down for eligibility. Attorney Thayer testified that, from the actions of James, Sr., it did not appear as if he was willing to give up control. Although Attorney Thayer testified about the Medicaid look-back period, whether the Properties might have been reached by Medicaid would appear to be a non-issue because of James, Sr.’s actions in deeding them back to himself. The evidence at trial was that James, Sr. was in full control of his senses, now, in 1997, 2000, and 2004. His signature in 1997 was as clear as when he signed the documents in 1994.

DISCUSSION

Plaintiffs James, Jr. and Susan have filed a four-count, verified complaint against defendants James, Sr. and Richard. They allege wrongdoing in connection with James, Sr.’s attempts to remove James, Jr. as trustee of the Almira Trust and the Rogers Trust (collectively “the Trusts”), remove Susan as successor trustee of the Rogers Trust, appoint himself as trustee, and transfer the Properties to himself in his individual capacity. In response, the defendants have individually asserted counterclaims against the plaintiffs regarding the creation of the Trusts and the initial transfer of the Properties.

I. The Plaintiffs’ Claims A. The Plaintiffs Claim for Declaratory Relief (Count I)

The plaintiffs’ Count I claim for declaratory relief requires the Court to evaluate the legitimacy of James, Sr.’s attempts to alter the Trusts’ trustees and transfer the Properties. For the following reasons, James, Sr. attempts to change the trustee of Almira Trust, and convey the Almira Property, were void and without legal effect. James, Sr. did, however, succeed in becoming the trustee of the Rogers Trust and transferring the Old Main Property to himself in his individual capacity. The Rogers Trust’s purpose became impossible because James, Sr. removed its entire corpus when he transferred the Old Main Property to himself. Therefore, the Rogers Trust is terminated by order of this Court.

1. 33 Almira Road Realty Trust

The evidence shows that James, Sr. and Betty made a valid gift of the Almira Property to the Almira Trust. The recipient of a gift “must demonstrate a settled donative intent on the part of the donor, together with an actual or symbolic delivery of the subject matter of the gift to him or to someone in his behalf in such manner as completely to transfer the dominion and control of it.” See Silverman v. A&L Heel Corp., 353 Mass. 108, 110 (1967). The evidence suggests that James, Sr. and Betty wanted to dispose of the Almira Property for Medicaid planning purposes. They decided to gift it to James, Jr. and Susan, the then-beneficiaries of their wills, by transferring it to James, Jr. as trustee. The deed they gave to James, Jr. on November 20,2000, evidenced its delivery.
*363 Additionally, James, Sr. did not have authority under the Almira Trust’s declaration of trust to remove trustee James, Jr. and appoint himself. The first page of the Almira Trust’s declaration names James, Jr. as trustee. The trust’s schedule of beneficiaries lists James, Jr. and Susan Farrell as the sole beneficiaries. The Almira Trust’s declaration does not refer to James, Sr., nor does it grant him the power to remove and appoint trustees. Therefore, his attempt to remove James, Jr. as beneficiary was not successful. See Phelps v. State Street Trust Co., 330 Mass. 511, 512 (1953) (“The law of Massachusetts is plain that a valid trust, once created, cannot be revoked or altered except by the exercise of a reserved power to do so . . .”). Therefore, on January 5, 2004, James, Sr. did not hold title to the Almira Property in any capacity, and could not convey it to himself.

2. Rogers Famüy Irrevocable Trust

The trust agreement for the Rogers Trust gave James, Sr. authority to remove James, Jr. as trustee, remove Susan as successor trustee, and appoint himself as the successor trustee. The trust agreement reserves for James, Sr. and Betty, as the donors, power to remove and appoint trustees. Section 5.2(a) provides that they may “remove any trustee by notice to that trustee.” In addition, under Section 5.1(b), they had the power to appoint successor and additional trustees. Section 5.3(a) clarifies that appointments and removals of trustees must be in writing, and copies shall be given to all of the trustees. Under Section 5.1(d), a trustee’s appointment is effective upon acceptance. Pursuant to these provisions, James, Sr. exercised his power to remove James, Jr. and Susan as trustees, appoint himself and then accept the appointment. The plaintiffs were given notice of this change in a letter dated January 8,2004. Accordingly, James, Jr. and Susan were removed, and James, Sr. became the trustee.
In addition, the Rogers Trust authorized James, Sr., in his capacity as trustee, to convey the Old Main property to himself in his individual capacity. “The interpretation of a written trust is a matter of law to be resolved by the court.” Schroeder v. Danielson, 37 Mass.App.Ct. 450, 453 (1994). Section 5.4(e) of the Rogers Trust provides that the trustee “shall have power without approval of any court and in any manner she considers advisable to sell, mortgage, exchange, lease, or otherwise dispose of or encumber any property on any terms.” James, Sr.’s conveyance of the Old Main Property by quitclaim deed in exchange for one dollar was contemplated by the terms “dispose” and “sell.” Further, as trustee, James, Sr. had discretion to dispose of the Old Main Property “in any manner [ ]he considers advisable.” A court is not able to substitute its judgment for the trustee’s as to matters left to its sole discretion. State Street Bank & Trust Co. v. Reiser, 7 Mass.App.Ct. 633, 635 (1979).
Further, language within the Rogers Trust manifests an intent to permit the trustee to transfer the Old Main Property back to James, Sr. or Betty. “Trust instruments must be construed to give effect to the intention of the settlor as ascertained from the language of the whole instrument considered in the light of the attendant circumstances.” Harrison v. Marcus, 396 Mass. 424, 429 (1985); see also Pond v. Pond, 424 Mass. 894, 897 (1997). Section 1.2 provides that the purpose of the Rogers Trust was “to manage the Donors’ assets and to use them to allow them to live in the community for as long as possible.” Transferring the Old Main Property to James, Sr. would facilitate this goal because it would help ensure that he continues to live there.
James, Sr.’s transfer of the Old Main Property to himself is not prohibited by Section 1.3, which provides that “[t]he trustee is absolutely prohibited from making any payments of principal or interest to or for the benefit of the Donors.” The Rogers Trust was created as a method of Medicare estate planning. Section 1.3 was most likely meant to prohibit payments to James, Sr. and Betty in order to ensure that the Rogers Trust was considered a “Medicaid Qualifying Trust.” The term “payment” within the Rogers Trust does not encompass the conveyance of land from one party to another, and instead contemplates monetary support.[1] This provision does not curtail the trustee’s power to dispose of property, or James, Sr.’s power to accept property, even if such a transfer might affect James, Sr.’s Medicaid eligibility.
James, Sr.’s conveyance of the Old Main Property makes the purposes of the Rogers Trust impossible to carry out. The Rogers Trust was created to manage the assets of James, Sr. and Betty, but the Old Main Properly comprised the entirety of the corpus. Massachusetts courts are empowered to terminate a trust where its purposes are impossible to achieve. Clymer v. Mayo, 393 Mass. 754, 763-64 (1985); Gordon v. Gordon, 332 Mass. 193, 197 (1955); Restatement (Second) of Trusts §335 (1959). Accordingly, this Court orders that the Rogers Trust be terminated.

B. The Plaintiffs’ Remaining Claims (Counts II through IV)

This Court will not grant the plaintiffs’ Count II request for a declaration enjoining the defendants from physically altering the Properties, violating any zoning ordinance affecting the Properties, failing to pay taxes or assessments on the Properties, or conveying the Properties. “[W]here there is no special reason for going beyond advice on present rights, a trial judge has a substantial range of discretion to deny or postpone declaratory relief, where he justifiably concludes that declaratory relief will not end a controversy, or is premature, or for other reasons.” Boston Safe Deposit & Trust Co. v. Dean, 361 Mass. 244, 248 (1972), citing G.L.c. 231A. James, Jr. holds legal title to the Almira Property as the Almira Trust’s sole trustee, and he and Susan are the only beneficiaries of the Almira Trust. James, Jr. and Susan may pursue adequate remedies at law in the event that the defendants take future actions against their property interests. At this point, their claim is premature.[2]
*364 The plaintiffs’ Count III claim that James, Sr. was unjustly enriched by gaining title to the Almira Property through fraud, accident, or mistake fails because James, Sr. never actually gained legal title to the Almira Property. Because James, Sr. was never unjustly enriched, there is no need to impose a constructive trust on the Almira Property for the plaintiffs’ benefit. See Kelly v. Kelly, 358 Mass. 154, 156 (1970) (holding that constructive trusts are imposed when a party improperly obtains legal title to another property).
The plaintiffs’ Count IV claim that Richard unduly influenced James, Sr. into reclaiming the Properties from the Trusts so that he could obtain a greater interest in them also fails. The Court treats this count as alleging fraud based on undue influence, rather than fraud in the sense of deceit.[3] “In order adequately to establish a claim for fraud based on undue influence, a plaintiff must establish that the defendant overcame the will of the grantor.” Tetrault v. Mahoney, 425 Mass. 456, 464 (1997), citing Corrigan v. O’Brien, 353 Mass. 341, 350 (1967). “Undue influence involves some form of compulsion which coerces a person into doing something the person does not want to do.” Tetrault, 425 Mass. at 464. A claim of undue influence requires proof “that an (1) unnatural disposition has been made (2) by a person susceptible to undue influence to the advantage of someone (3) with an opportunity to exercise undue influence and (4) who in fact has used that opportunity to procure the contested disposition through improper means.” Id., citing Heinrich v. SilvernaiL, 23 Mass.App.Ct. 218, 223 (1986). The party challenging a disposition on the ground of fraud or undue influence bears the burden of proving his allegations by a preponderance of the evidence. Cleary v. Cleary, 427 Mass. 286, 290 (1998).[4]
The plaintiffs did not show that Richard overcame James, Sr.’s will. Any attempt by James, Sr. to redistribute the corpus of the Trusts from one son to the other was natural. Cf. Popko v. Janik, 341 Mass. 212, 215 (1960) (finding unnatural disposition when testator left house to housekeeper). Moreover, the plaintiffs did not show that James, Sr. was even susceptible to undue influence. “When the donor is enfeebled by age or disease, although not reaching to unsoundness of mind, and the relation between the parties is fiduciary or intimate, the transaction ordinarily is subject to careful scrutiny.” Neill v. Brackett, 234 Mass. 367, 369 (1920). Although James, Sr. was eighty-six years old, and his health had deteriorated, the preponderance of the evidence suggests that he was not mentally enfeebled.[5]
Nor did the plaintiffs show that Richard was in a position to influence James, Sr. Richard, a veteran, has been 100% disabled since 1997. In the 1970s he was incapacitated by Hodgkins disease. In December 2002, he had a quadruple by-pass, and a new valve and pacemaker installed in his heart. It is not evident, however, that Richard was in a position to influence James, Sr. merely because he prepares his meals, takes him to the shower, drives for him, and participated in all of his meetings with Attorney Perry. Additionally, even if James, Sr. was susceptible to Richard’s influence, the mere opportunity for family members to exert undue influence is insufficient. Johnson v. Loring, 267 Mass. 310, 312 (1929); Neill, 234 Mass. at 369. There is no evidence that Richard actually used any opportunity to overcome James, Sr.’s will and convince him to “break the Trusts.” It is just as likely, for example, that the sole motivation for J ames, Sr.’s actions was the disagreement about control of the Properties. Accordingly, the plaintiffs have not met their burden of proof on Count IV.

II. The Defendants’ Counterclaims

On the merits, there was insufficient evidence at trial to support any of the defendants’ counterclaims arising out of the plaintiffs’ alleged acts in connection with the creation of the Trusts and transfer of the Properties.[6]

A. Counts I, III, and IV of James, Sr. ’s Counterclaim, and Counts I, II, and III of Richard’s Counterclaim

Both James, Sr., in his Count I counterclaim, and Richard, in his Count II counterclaim, allege that the plaintiffs breached a fiduciary duty to them in connection with the creation of the Trusts. These claims fail, however, because there was no fiduciary relationship between the parties. A fiduciary relationship may be created “(w]here a plaintiff reposes trust and confidence in the defendant, and the defendant knows of the plaintiffs reliance on him.” Cahaly v. Benistar Prop. Exch, 68 Mass.App.Ct. 668, 680 (2007). “Itis settled in this Commonwealth that a fiduciary relationship does not arise merely because the parties to a conveyance are members of the same family.” Kelly, 358 Mass. at 156. Additional factors, however, may give rise to such a relationship. Id., citing Samia v. Central Oil Co. of Worcester, 339 Mass. 101, 112 (1959) (finding fiduciary relationship between brother and sisters when they had a “closely knit” relationship); see also Sullivan v. Rooney, 404 Mass. 160, 163-64 (1989) (finding relationship of trust and confidence when plaintiff was less educated and experienced than defendant, relied on defendant for long period of time in important matters, and gave up career to maintain a home with defendant upon assurances that they would own it together). Whether a relationship of trust and confidence exists is a question of fact. Collins v. Huluack, 57 Mass.App.Ct. 387, 394 (2003).
This Court finds that J ames, Sr. did not rely on J ames, Jr. in financial matters, or place his trust and confidence in him for his important affairs. James,' Sr. merely affirmed that James, Jr. was experienced with buying, renovating, and selling homes, and that James, Jr. urged his parents to place the Properties in a trust for Medicaid planning purposes. There was no allegation that James, Jr. took responsibility for James, Sr.’s financial affairs, or had any type of close relationship with James, Sr. Moreover, both James, Sr. and Betty had an opportunity to read the trust documents, and speak to the attorney who prepared them before execution. They both executed the Trusts knowing the identity of the beneficiar *365 ies. Cf. Markell v. Sidney B. Pfeifer Found Inc., 9 Mass.App.Ct. 412, 443 (1980) (finding relationship of trust and confidence when defendant obtained plaintiff s signature on documents knowing that defendant had not read or understood them), overruled on other grounds by Cleary v. Cleary, 427 Mass. 286, 295 (1998).
There is even less evidence showing a fiduciary relationship between James, Jr. and Richard. Rather than a relationship of trust and confidence, the two brothers have an antagonistic relationship. James, Sr., in an affidavit, stated that “Jim, Jr. has blamed Richard for everything,” and that “Jim, Jr. does not care for Richard and puts him down when he can.” More importantly, however, none of the property donated to the Trusts belonged to Richard. In sum, Richard failed to put forth any evidence showing that he had entrusted James, Jr. with his financial affairs. Accordingly, the plaintiffs did not breach a fiduciary duty to either defendant.
In Count III of his counterclaim, James, Sr. claims that James, Jr. obtained an interest in the Properties by “fraud, deceit, misrepresentation, and/or by exerting undue influence.” Each of the claims alleged in Count III are without merit, and are disposed of in turn.
James, Sr. first argues that he executed the Trusts while relying on James, Jr.’s alleged representation that transferring the Properties to the Trusts was James, Sr. and Betty’s only option for Medicaid planning. James, Sr. also argues that James, Jr. indicated that Trusts would not give a present property interest to the sons by allegedly telling him that the Trusts would “mirror the wills.” In order to establish a claim for fraudulent misrepresentation, a plaintiff must show that the defendant “made a false representation of a material fact with knowledge of its falsity for the purpose of inducing the plaintiff to act thereon, and that the plaintiff reasonably relied upon the representation as true and acted upon it to his damage. ” Russell v. Cooley Dickinson Hospital, Inc., 437 Mass. 443, 458 (2002), quoting Danca v. Taunton Sav. Bank, 385 Mass. 1, 8 (1982).
James, Sr. has not presented evidence that James, Jr. represented to James, Sr. that the Trusts, as arranged, were the only possible way to distribute the Properties so as to properly plan for Medicaid. James, Jr.’s alleged statement that the Trusts would “mirror the wills” is not false. Just like the Trusts, the wills gave James, Jr. an interest in the Almira Property, and Richard an interest in the Old Main Property. Even if James, Jr. did indicate that the Trusts would not grant a present interest to anyone but James, Sr. and Betty, James, Sr. could not have reasonably relied on that representation. All of the parties, including James, Sr. and Betty, read the declarations of trust for the Trusts in detail on the day they were executed. James, Sr. and Betty then consulted with Attorney Brewin outside the presence of James, Jr. James, Sr. acknowledged that, in doing so, he discovered that the beneficiaries of the Almira Trust were James, Jr. and Susan. He also acknowledged that he and Betty then transferred their interest in the Almira Property to James, Jr. as trustee for those beneficiaries. In this scenario, James, Sr. could not have reasonably thought that he was retaining all present interest in the Almira Property while deeding it away to a trust that listed others as beneficiaries.
In the alternative, James, Sr. argues that both he and James, Jr. mistakenly thought the Trusts were the only possible way to properly plan for Medicaid and that the Trusts would only give his sons an interest after their parents’ deaths. A completed gift of real estate can be set aside upon proof of mistake. Mozynski v. Wells, 330 Mass. 7, 8 (1953). Only a mutual mistake made by both parties, or a mistake made by one party and known to the other, is a ground for equitable relief. Polaroid Corp. v. Travelers Indem. Co., 414 Mass. 747, 756 (1993). The record is completely devoid of evidence that James, Jr. thought that the Trusts needed to be created in the manner that they were, or that he and Richard would obtain an interest only after their parents’ death. Nor was there evidence that James, Jr. knew this is what his father allegedly thought. Accordingly, James, Sr. has failed to satisfy his burden of proof as to this claim.
Finally, James, Sr. argues that James, Jr. unduly influenced his decision to execute the Trusts in November 2000. This argument fails because James, Sr. did not prove any of the four essential elements for a claim of undue influence. James, Sr. naturally disposed of the Properties when he gave present and future interests in them to his sons, James, Jr. and Richard. In addition, this Court has already found that James, Sr. was not susceptible to undue influence when he attempted to alter the trustees of the Trusts and convey the Properties years later, in January 2004, when his health was worse. In November 2000, James, Sr. could ambulate with a cane, did not require the daily care from Richard, and had not suffered a further deterioration of the medical condition with his back.
Furthermore, James, Jr. was not in a position to exercise undue influence over James, Sr. In November 2000, James, Sr. lived with Betfy and made the decision to enter into the Trusts in conjunction with her. By that time in his life, James, Sr. had previously purchased and sold five to six other properties. There is no evidence that he depended on James, Jr. for financial advice, or otherwise. James, Sr. further asserts that, when looking over the documents on November 20, 2000, he was drowsy and his medications had affected his ability to understand. Even if the Court were to credit this testimony, the evidence did not show that James, Jr. used any potential window of opportunity to overcome James, Sr.’s will. Accordingly, James, Sr.’s undue influence claim fails.
In Count III of Richard’s counterclaim, Richard argues that the plaintiffs are liable to him in quantum meruit because he has allegedly provided personal service, care and maintenance to James, Sr. and Betty for over thirty years for the benefit of the plaintiffs.[7] *366 “The underlying basis for awarding quantum meruit damages in a quasi-contract case is unjust enrichment of one party and unjust detriment to the other party.” Salamon v. Terra, 394 Mass. 857, 859 (1985). “The injustice of the enrichment or detriment in quasi-contract equates with the defeat of someone’s reasonable expectations.” Id. at 860; see also Santagate v. Tower, 64 Mass.App.Ct. 324, 336 (2005) (holding that the reasonable expectations of the parties determines whether a benefit is unjust). Richard puts forth no evidence, however, that would establish that had a reasonable expectation of being compensated for his care of James, Sr. Accordingly, this claim fails.
Both James, Sr., in Count IV of his counterclaim, and Richard, in Count I of his counterclaim, seek damages for emotional distress. Neither defendant is entitled to such damages because they both failed to prove a cause of action for which they can recover them.

B. James, Sr. ’s Count II Counterclaim for Declaratory Relief and Count V Claim for Equitable Relief

As discussed above, James, Sr. had presented to the Court no grounds upon which it can declare that the Trusts are either void, voidable at his option, or held in constructive trust for his benefit. James, Jr. did not improperly cause James, Sr. to convey the Almira Property to the Almira Trust, create the Rogers Trust, or convey the Old Main Property to the Rogers Trust. Accordingly, James, Sr. is not entitled to the declaratoiy relief he seeks in Count II of his counterclaim.
Finally, in Count V of James, Sr.’s counterclaim, he asks the Court to impose a constructive trust on the Properties for his benefit. A constructive trust “is imposed ‘in order to avoid the unjust enrichment of one party at the expense of the other where the legal title to the property was obtained [a] by fraud or [b] in violation of a fiduciary relation or [c] where information confidentially given or acquired was used to the advantage of the recipient at the expense of the one who disclosed the information.’ ” Kelly, 358 Mass. at 156, quoting Barry v. Covich, 332 Mass. 338, 342 (1955); see also Meskell v. Meskell 355 Mass. 148, 151 (1969). As explained above, James, Jr. did not obtain title to the corpus of these trusts through fraud or breach of a fiduciary relationship. Nor was there any evidence that the plaintiffs used any confidential information to the advantage of the defendants. Accordingly, there is no basis for the imposition of a constructive trust for the benefit of James, Sr.

ORDER FOR JUDGMENT

For the foregoing reasons, it is hereby ORDERED that judgment enter as follows:
1.On Count I of the plaintiffs’ complaint, a declaration shall enter (1) voiding defendant James, Sr.’s conveyance of the Almira Property from himself as trustee of the Almira Trust to himself in his individual capacity; (2) affirming that James, Jr. and Susan are the only beneficiaries of the Almira Trust; and (3) affirming that plaintiff James, Jr. is the sole trustee of the Almira Trust. No further declaratory relief is granted for the plaintiffs.
2. On Counts II through IV of the plaintiffs’ complaint, judgment shall enter for the defendants.
3. On Count II of defendant James, Sr.’s counterclaim, a declaration shall enter (1) affirming that James Sr. owns the Old Main Property in his individual capacity as a result of his conveyance on January 5, 2004, and (2) terminating the Rogers Trust because its purposes are now impossible to fulfill.
4. On Counts I, III, IV, and V of defendant James, Sr.’s counterclaim, judgment shall enter for the plaintiffs.
5. On Counts I though III of defendant Richard’s counterclaim, judgment shall enter for the plaintiffs.

A qualifying trust shelters trust assets when no “payment” can be made from the trust to the Medicaid beneficiary. Gueniero v. Commissioner of the Div. of Med. Assistance, 433 Mass. 628, 630-31 (2001) (discussing 42 U.S.C. §1396p (d) (3) (B)).

Moreover, the plaintiffs have failed to show they have any property interest at all in the Old Main Property.

In Count IV, the plaintiffs assert that Richard “engaged in undue influence and fraud” to the plaintiffs’ detriment by abusing his relationship with James, Sr. Massachusetts R.Civ.P. 8(f) provides that “(a]ll pleadings shall be so construed as to do substantial justice.” A claim for fraud based on undue influence exists when a party claims that “an individual’s free agency has been destroyed.” Tetrault v. Mahoney, 425 Mass. 456. 463 n.7 (1997). In this circumstance, the expected evidence “relates only influence exerted through coercion rather than through deception.” Id., quoting Mirick v. Phelps, 297 Mass. 250, 252 (1937). In this case, the plaintiffs argued that Richard engaged in such coercion by somehow influencing James, Sr. to execute the documents of January 5, 2004. “Fraud, in the sense of deceit, however is a separate cause of action . . .” Tetrault 425 Mass. at 463 n.7, quoting Wellman v. Carter, 286 Mass. 237, 252-53 (1934). In that circumstance, “the testator [is] proceeding of his own free will but affected by a false representation of a fact which is the inducement for the disposition in question.” Wellman, 286 Mass. at 253. The plaintiffs did not make arguments based on deceit.

The plaintiffs would have had the burden of proof to show that there was no undue influence if they were in a fiduciary relationship with the defendants. See Cleary, 427 Mass. at 290. There was, however, no such fiduciary relationship. See discussion of breach of fiduciary duty in Part II. A., infra.

James, Sr.’s physician since July of 2001 affirmed that he has never shown signs of mental incapacity, and “has a thorough understanding of his legal situation.” James, Sr.’s demeanor was angry, authoritative, clear in terms of his wishes. It was that of an army drill sergeant, not of someone whose will had been overcome.

James, Jr. and Susan, as defendants-in-counterclaim, moved this Court to dismiss the defendants’ counterclaims pursuant to Mass.R.Civ.P. 41. They alleged that the counterclaims are barred by the two-year statute of limitations in G.L.c. 260, §2A for tort claims. The Court declines to rule on this motion because it has disposed of the defendants’ counterclaims on the underlying substance of those claims.

This count of Richard’s counterclaim is mislabeled as a second “Count II.”